**CROSSLAND FEDERAL SAVINGS BANK, By the FEDERAL DEPOSIT INSURANCE CORPORATION, as Conservator, Plaintiff,**

v.

**A. SUNA & COMPANY, INC., Alan Suna, and the Estate of Harry Suna, By its executrix Bernice Suna, Defendants.**

No. 92 CV 3919.

United States District Court, E.D. New York.

June 13, 1996.

Herrick, Feinstein, LLP (Darlene Fairman, of counsel), New York City, for plaintiff.

Ballon Stoll Bader & Nadler, P.C. (Marshall B. Bellovin, of counsel), New York City, for defendants.

## MEMORANDUM AND ORDER

NICKERSON, District Judge:

In a carefully reasoned Report and Recommendation dated September 29, 1995 Magistrate Judge Robert M. Levy recommended that the court (1) grant the motion of plaintiff CrossLand Federal Savings Bank (CrossLand) to amend the complaint to reflect that it is no longer under the conservatorship of the Federal Deposit Insurance Corporation, and (2) grant CrossLand's motion for summary judgment against defendants Alan Suna and the Estate of Harry Suna.

The court has reviewed the Report and Recommendation and defendants' objections to it, agrees with the reasoning of the Magistrate Judge, and approves the Report and Recommendation.

Accordingly, the court grants CrossLand's motions to amend the complaint and for summary judgment against Alan Suna and the Estate of Harry Suna, and refers the matter to Magistrate Judge Levy to determine (1) the amount owed by Alan Suna and the Estate of Harry Suna under the Guarantee and (2) the amount of attorneys fees and costs incurred by CrossLand for which these defendants are liable.

So ordered.

## REPORT AND RECOMMENDATION

LEVY, United States Magistrate Judge:

Plaintiff CrossLand Federal Savings Bank moves for summary judgment and to amend the complaint to reflect the fact that it is no longer under the conservatorship of the Federal Deposit Insurance Corporation ("FDIC"). By order dated December 14, 1992, the Honorable Eugene H. Nickerson, United States District Judge, referred this case to then Magistrate Judge Zachary Carter to report and recommend on all dispositive motions. On January 28, 1993, this case was reassigned to then Magistrate Judge Allyne R. Ross, and upon her appointment as district judge the case was reassigned to Magistrate Judge John L. Caden. Finally, on March 24, 1995, the above-captioned matter was referred to the undersigned. For the reasons set forth below, the undersigned respectfully recommends that plaintiff's motion for summary judgment be granted and that damages be awarded in the amount of three million dollars, plus interest, attorneys' fees and costs.

### Background

There are no disputes with regard to the material facts of this case. On May 26, 1988, CrossLand Savings, F.S.B. ("Old CrossLand") loaned A. Suna & Co. ("Suna Co.") three million dollars. The loan was evidenced by a promissory note (the "Original Note") and agreement for the extension of a revolving line of credit (the "Original Agreement"). As part of the Original Agreement, Harry and Alan Suna, both officers of Suna Co., executed and delivered an unconditional guaranty of the payment of Suna Co.'s obligations (the "Guaranty"). Old CrossLand and Suna Co. then modified the Original Agreement on March 14, 1990, creating an "Amended Agreement." Harry and Alan

Suna executed a new promissory note (the "Replacement Note") at that time. The Replacement Note became due on August 31, 1991, and has not yet been repaid.

On January 23, 1992, the Director of the Office of Thrift Supervision (the "OTS") closed Old CrossLand and appointed the FDIC as its receiver. A new bank, CrossLand Federal Savings Bank ("New CrossLand") was formed on the same date and the FDIC was appointed as its conservator. New CrossLand subsequently purchased the assets of Old CrossLand, including the assets that form the basis of this action.

On March 18, 1992, after Harry Suna, Chairman of Suna Co., indicated a desire to discuss a possible workout or restructuring of the loan, the executive board of New CrossLand met to discuss the Suna Co. credit agreement. The board authorized Tom Murphy, then the Vice–President designated to handle the Suna Co. loan, to restructure the credit agreement into a term loan. However, authorization for Mr. Murphy to offer this modification to Suna Co. was conditional upon two changes from the terms originally suggested by Mr. Murphy. The term of the loan was to be limited to one year instead of two, and the $30,000 fee suggested by Mr. Murphy was to be applied to the principal rather than being paid as a fee. On March 24, 1992, Mr. Murphy sent a fax to Harry Suna. The fax, which included a handwritten note on the cover sheet and was signed "Tom," listed some of the conditions for restructuring the Suna Co. loan; it also included an amortization schedule for the proposed term loan.

Before any settlement discussions took place, and later while such discussions were ongoing, New CrossLand sent a series of letters (the "pre-negotiation letters") to Suna Co. These letters specified that although New CrossLand wished to negotiate with Suna Co., it had not yet agreed to modify the existing loan. The letters also stressed that all settlement discussions would be without prejudice and that changes to the existing agreement were to become effective only when "definitive documentation" had been signed. Although New CrossLand requested that he do so, Harry Suna did not sign and return the first pre-negotiation letter, dated April 20, 1992.

Harry Suna died on May 6, 1992. New CrossLand then engaged in workout discussions with Stuart Suna, Harry Suna's successor as Chairman of Suna Co., and sent a second pre-negotiation letter to Stuart Suna, dated June 11, 1992. That letter also went unexecuted. Following further workout discussions between Mr. Murphy and Stuart Suna, Mr. Murphy sent Stuart Suna a one-page letter summarizing the agreed-upon points in their negotiations and proposing additional terms requested by New CrossLand's loan committee. That letter, dated June 15, 1992, was never signed by either of the parties. However, Stuart Suna executed a third pre-negotiation letter, dated July 22, 1992, which contained language substantially similar to that of the earlier pre-negotiation letters. Specifically, the July 22, 1992 pre-negotiation letter stated:

> [New CrossLand] has not offered, and is not at this meeting offering, either orally or in writing to waive or forbear from exercising any rights or remedies it may have against the Borrower; and ... [New CrossLand] has not, and is not at this meeting offering to make any new loans or grant or extend any financial accommodations to the Borrower.

New CrossLand demanded payment on the Replacement Note by letters dated July 7, 1992 and July 23, 1992. When payment was not received, New CrossLand initiated this action on August 17, 1992. On May 21, 1993, an involuntary petition for bankruptcy was filed against Suna Co.; the petition was converted to a Chapter 11 bankruptcy petition on July 19, 1993. As a result of Suna Co.'s bankruptcy, New CrossLand is pursuing only its claims against Alan Suna and the Estate of Harry Suna, the guarantors of the loan agreement.

On August 19, 1993, the FDIC ended its conservatorship of New CrossLand, which thereupon became a privately-owned, federally chartered stock bank. New CrossLand subsequently reorganized. In March 1994, Brooklyn Bancorp ("Bancorp") was formed as a holding company for New CrossLand, which became a wholly owned subsidiary of

Bancorp. All shares of New CrossLand stock were exchanged for Bancorp stock; New CrossLand then merged with Cross-Land Interim Federal Savings Bank, a Bancorp subsidiary. New CrossLand emerged as the surviving bank and a wholly-owned subsidiary of Bancorp.

New CrossLand filed the present motion for summary judgment before then Magistrate Ross on September 14, 1994. On October 21, 1994, the summary judgment motion was stayed on consent of both parties, and New CrossLand withdrew the motion on December 19, 1994. The motion was reinstated on March 31, 1995, and oral argument was held before the undersigned on June 6, 1995.

### 1. *New CrossLand's Motion to Amend the Complaint.*

As an initial matter, New CrossLand seeks leave to amend the caption of its complaint to reflect the fact that it is no longer under the conservatorship of the FDIC. Materials submitted by both parties, including the shareholder's report and the affidavits submitted by New CrossLand, demonstrate that on August 19, 1993, New CrossLand became a privately owned stock bank that is no longer under the conservatorship of the FDIC.

■ Rule 15(a) of the Federal Rules of Civil Procedure states that leave to amend a pleading "shall be freely given when justice so requires." It is an abuse of discretion for the court to deny a motion for leave to amend a pleading in the absence of undue delay, bad faith or improper motive, unless the amendment would be futile or meritless. *Cortec Indus. v. Sum Holding L.P.*, 949 F.2d 42, 49 (2d Cir.1991). *See also Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962). The party opposing the motion for leave to amend has the burden of demonstrating that the amendment would be prejudicial, contrary to justice or futile. *Tucker Leasing Capital Corp. v. Marin Med-*

*ical Mgt., Inc.*, 833 F.Supp. 948, 960 (E.D.N.Y.1993).

■ The Sunas advance two arguments in opposition to plaintiff's motion to amend. First, they contend that New CrossLand's motion must be denied because plaintiff has failed to comply with FED.R.CIV.P. 25(c), which provides:

> [i]n any case of transfer of interest, the action may be continued by or against the original party, unless the court upon motion directs the person to whom the interest is transferred to be substituted in the action or joined with the original party.

The Sunas argue that the merger of New CrossLand and Crossland Interim Savings Bank to form a new bank as a subsidiary of Bancorp creates a triable issue of fact as to who owns the Amended Agreement, the Replacement Note and the Guaranty which form the basis of this litigation. Specifically, the Sunas allege that assets were transferred from New CrossLand to Bancorp and that Bancorp may now be the proper party in interest. The Sunas' argument is without merit. Indeed, the language of FED.R.CIV.P. 25(c) itself undermines their argument, since it states explicitly that even where there has been a transfer of interest the action may be continued "by or against the original party." Thus, even if there had been a transfer of interest to Bancorp, New CrossLand would still be permitted to continue the action as the original party.

In addition, the Sunas have introduced no evidence that a transfer of interest to Bancorp ever took place.[1] The documents offered by both parties, including the shareholder's report and 10–K report from OTS offered by the Sunas, support the conclusion that, while Bancorp acquired all of New CrossLand's stock, it did not actually acquire any of New CrossLand's assets. The Sunas are incorrect, therefore, in arguing that there is a triable issue of fact as to whether New CrossLand is the proper party in interest.

---

**1.** There was, of course, an earlier transfer of interest when the OTS closed Old CrossLand. The purchase agreement submitted by New CrossLand shows that it acquired Old Cross-Land's assets, including the Amended Agreement, the Replacement Note and the Guaranty.

However, that transfer occurred on or about January 23, 1992, almost seven months prior to the initiation of the present action. That transfer is wholly irrelevant to the current case since New CrossLand is correctly listed as the named plaintiff.

Second, the Sunas argue that plaintiff's motion to amend violates FED.R.CIV.P. 25(a), which falls under the subheading "Death." Rule 25(a) states:

> If a party dies and the claim is not thereby extinguished, the court may order substitution of the proper parties. The motion for substitution may be made by any party or by the successors or representatives of the deceased party and, together with the notice of hearing, shall be served on the parties as provided in Rule 5 and upon persons not parties in the manner provided in Rule 4 for the service of a summons, and may be served in any judicial district. *Unless the motion for substitution is made not later than 90 days after the death is suggested upon the record by service of a statement of the fact of the death as provided herein for the service of the motion, the action shall be dismissed as to the deceased party.* (emphasis added)

Since Rule 25(c), concerning transfers of interest, refers to Rule 25(a) in the context of service of process,[2] the Sunas claim that the ninety-day limit on motions to amend the complaint following the death of a party set forth in Rule 25(a) somehow applies to motions to amend after transfers of interest in the corporate context. In other words, the Sunas argue that the motion to amend is time-barred because plaintiff failed to make the motion within ninety days of the transfer of interest. However, there is no support for this position in either the procedural rules or the case law.

*Miles, Inc. v. Scripps Clinic & Research Foundation,* 810 F.Supp. 1091 (S.D.Ca.1993), which defendants cite in support of their position, is not applicable to the instant case. In *Miles,* the court dismissed causes of action against an estate that was not substituted as a party within ninety days of the defendant's death. The court in *Miles* did not rely on or even mention Rule 25(c) and it did not state that Rule 25(a) applies to corporate transfers of interest. *United States v. Transocean Air*

*Lines, Inc.,* 356 F.2d 702 (5th Cir.1966), also cited by defendants, is equally inapposite. There, the court held that a trustee in bankruptcy who never made a motion to be substituted as a party for a bankrupt corporation did not become a party to the action. The court in *Transocean Air Lines* did not mention a ninety-day limitation on motions to amend in any context. Accordingly, defendant provides no authority for its argument that the ninety-day limitation on motions to substitute after the death of a party under Rule 25(a) applies to transfers of interest under Rule 25(c).

Since New CrossLand has demonstrated that it is no longer under the conservatorship of the FDIC, and since the Sunas have offered no compelling reason for the court to deny New CrossLand's motion, the undersigned respectfully recommends that New CrossLand's motion to amend the complaint be granted.[3]

### 2. *New CrossLand's Motion for Summary Judgment.*

New CrossLand also moves for summary judgment against Alan Suna and the Estate of Harry Suna, as guarantors of the Amended Agreement and the Replacement Note. Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The court must consider the burdens of production and proof that would be required at trial. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Summary judgment should be awarded, therefore, when the party bearing the burden of proof with regard to a critical element of a claim or defense fails to make a sufficient evidentiary showing as to that element. *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552.

---

**2.** Rule 25(c) states that service of a motion to substitute a party "shall be made as provided in subdivision (a) of this rule."

**3.** Even if, as the Sunas contend, New CrossLand was required to comply with FED.R.CIV.P. 25(a) and amend its complaint within 90 days of its

transfer of interest, FED.R.CIV.P. 6(b)(2) allows the court to grant an extension for good cause after the initial period of time has elapsed. It is not necessary to reach this issue, however, because the Sunas' arguments are clearly without merit.

The initial burden in this case rests with New CrossLand, which must demonstrate that the guarantors remain liable on the Replacement Note. A creditor establishes its *prima facie* case against a debtor by offering proof of the three elements of its claim: (1) an executed loan agreement; (2) a promissory note payable to the creditor; and (3) evidence that the note has not been paid. *E.g., Banner Indus., Inc. v. Key B.H. Assocs.,* 170 A.D.2d 246, 246, 565 N.Y.S.2d 456, 456 (1st Dep't. 1991); *Kornfeld v. NRX Technologies, Inc.,* 93 A.D.2d 772, 773, 461 N.Y.S.2d 342, 343 (1st Dep't. 1983), *aff'd,* 62 N.Y.2d 686, 465 N.E.2d 30, 476 N.Y.S.2d 523 (1984).[4] Evidence of an executed guaranty is the final element of plaintiff's *prima facie* case since New CrossLand is pursuing its claims against the guarantors. *117–14 Union Turnpike Assoc. v. L.P. County Dollar Corp.,* 187 A.D.2d 357, 357, 589 N.Y.S.2d 880, 880 (1st Dep't. 1992); *Key Bank of Long Island v. Burns,* 162 A.D.2d 501, 502, 556 N.Y.S.2d 829, 830 (2d Dep't. 1990). New CrossLand has submitted copies of the executed Amended Agreement, Replacement Note and Guaranty, along with an affidavit of non-payment (the "Kramer affidavit"). The Sunas do not dispute the validity of this evidence, nor do they maintain that the loans have been repaid. Accordingly, New CrossLand has met its initial burden for summary judgment.

The Sunas oppose summary judgment by raising several affirmative defenses. First, they contend that New CrossLand is not the proper party in interest. Second, they argue that Old CrossLand made an oral promise to provide life insurance in the name of Harry Suna, and that the failure of the bank to perform this obligation relieves the guarantors of their responsibility under the loan agreement. Third, the Sunas contend that alteration of the loan agreement and related documents released the guarantors from the Guaranty. Finally, the Sunas maintain that the bankruptcy stay that prevents New CrossLand from pursuing its claims against Suna Co. also prevents the bank from enforc-ing its rights against guarantors Harry and Alan Suna.

It is well-settled that a party cannot avoid summary judgment simply by raising conclusory allegations or unfounded opinions. *See Western World Ins. Co. v. Stack Oil, Inc.,* 922 F.2d 118, 121 (2d Cir.1990) (summary judgment motion cannot be defeated through " 'mere speculation or conjecture' ") (*quoting Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987)); *Borthwick v. First Georgetown Securities, Inc.,* 892 F.2d 178, 181 (2d Cir.1989) (opposing party cannot "escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts"). Moreover, a mere "scintilla" of evidence is insufficient to withstand summary judgment; rather, the adverse party must "set forth specific facts showing that there is a genuine issue for trial." *Liberty Lobby,* 477 U.S. at 250–51, 106 S.Ct. at 2511–12. The party opposing summary judgment must also demonstrate that any factual issue it raises is a material issue capable of affecting the outcome of a trial. *Id.* at 248, 106 S.Ct. at 2510. A material issue is one that would allow a reasonable jury to return a verdict for the non-moving party. *Id.* When the burden of proof on a particular claim or defense rests with the party opposing the summary judgment motion, the moving party is not required to negate the adverse party's claim, nor is it required to make any evidentiary showing with respect to that claim or defense. The moving party may prevail simply by revealing the lack of evidence to support the adverse party's position. *Celotex,* 477 U.S. at 323, 325, 106 S.Ct. at 2552, 2554. Accordingly, New CrossLand can succeed here by demonstrating that each of defendants' affirmative defenses is either factually or legally insufficient to create a triable issue of fact. Each of the Sunas' affirmative defenses will be addressed in turn.

---

4. It is undisputed that New York law is controlling for the Amended Agreement, Replacement Note and Guaranty in this case. Section 10(e) of the Original Agreement and Paragraph 11 of the Guaranty both contain New York choice of law provisions, which courts consistently have enforced. *See, e.g., Chemical Bank v. Layne,* 423 F.Supp. 869, 871 (S.D.N.Y.1976).

### A. Real Party in Interest

■ First, as explained above, defendants argue that there is a material issue of fact as to whether New CrossLand is the proper party in interest. According to the Sunas, plaintiff may not be the real party in interest because it does not hold the Amended Agreement, Replacement Note and Guaranty that form the basis for this litigation. In response to this argument, New Cross-Land has offered considerable proof that it is the current holder of those documents. Affidavits and other records submitted by plaintiff show that New CrossLand is the owner of the relevant instruments and is the correct party in this case.[5] The Kramer affidavit demonstrates that New CrossLand, having purchased all of the assets of Old CrossLand, is the current holder of the Replacement Note, Amended Agreement and Guaranty. New CrossLand has also submitted other materials that recount the chain of title by which New CrossLand acquired these instruments. The purchase agreement and the Strazza affidavit establish that New Cross-Land acquired the Suna Co. loan from Old CrossLand when the latter was closed by OTS. While Bancorp later acquired New CrossLand, New CrossLand retained all of its assets. Plaintiff has therefore met its burdens of production on this issue, as it has offered compelling evidence to suggest that it is the correct party in this case.

Despite all of this evidence, the Sunas contend that New CrossLand is not the correct party in interest and is not the current holder of the Replacement Note, Amended Agreement and Guaranty. Pointing to New CrossLand's reorganization as a subsidiary of Bancorp, the holding company created for the purpose of reorganizing New CrossLand, the Sunas argue that Bancorp is the real party in interest, or at the very least, that there is a triable issue of fact as to who is the real party in interest. However, speculation and unsubstantiated allegations are insufficient to avoid summary judgment. *See Western World Ins. Co.*, 922 F.2d at 121; *Borthwick*, 892 F.2d at 181. Since New

CrossLand has met its burden of production by submitting the Strazza affidavit and the purchase agreement, the Sunas must produce evidence in support of their position in order to create a triable issue of fact.

The materials submitted by the Sunas, however, support New CrossLand's contention that it is the proper party in interest. The shareholder's report submitted by defendants states that Bancorp has no independent assets of its own. Its only asset is New CrossLand, its subsidiary company. (*See* Shareholder Report, Suna Exhibit 17, pp. 47–51). Another report submitted by the Sunas substantiates the chain of title set forth in the Strazza affidavit. (*See* 10–K report, Suna Exhibit 16, p. 1). Defendants have offered no evidence to support their contention that a party other than New CrossLand is the holder of the Suna Co. loan documents. Accordingly, they have failed to establish that a material issue of fact exists on this issue.

### B. Defendants' Remaining Affirmative Defenses

■ New CrossLand argues that the court need not consider the validity of the Sunas' remaining affirmative defenses in order to award summary judgment. Relying on the waiver of rights in paragraph 2 of the Guaranty, New CrossLand argues that the Sunas have surrendered their right to assert any of these affirmative defenses. Paragraph 2 of the Guaranty states:

> This Guarantee is, and shall be construed as, a continuing, unlimited, absolute and unconditional guarantee of payment of the Obligations and indemnity for claims relating thereto without regard to the legality, validity, regularity, or enforceability of any of the Obligations or of any of the agreements pursuant to which any of the Obligations arose or were created or any other agreement related thereto, and without regard to any other circumstances whatsoever which might otherwise constitute a legal or equitable discharge of a surety or guar-

---

5. Of course, as explained above, even if New CrossLand had transferred the Amended Agreement, Replacement Note and Guaranty to Ban-

corp or some other entity, it would nonetheless have standing to maintain this action pursuant to Rule 25(c).

antor, including, without limitation, any right of setoff or counterclaim.

When an executed guaranty contains such unconditional language, the guarantors are barred from raising any affirmative defenses. *See Regency Equities Corp. v. Reiss*, 1995 WL 362496, at *2 (S.D.N.Y. June 16, 1995) (when terms of guaranty are "unconditional" debtor "has waived this defense [of novation], along with all other defenses. . . ."); *New Jersey Bank Nat'l Assoc. v. Varano*, 120 A.D.2d 505, 505, 502 N.Y.S.2d 35, 36 (2d Dep't.1986) (guarantor signing guaranty waiving rights to assert counterclaims or defenses is bound by the terms of the guaranty). Where, as here, the guarantors have unconditionally waived all of their defenses, the court need not consider any affirmative defenses, and summary judgment is therefore appropriate. *See Grumman Allied Indus., Inc. v. Rohr Indus., Inc.*, 748 F.2d 729, 735 (2d Cir.1984) ("where the parties to an agreement have expressly allocated risks, the judiciary shall not intrude into their contractual relationship") (*citing Danann Realty Corp. v. Harris*, 5 N.Y.2d 317, 184 N.Y.S.2d 599, 157 N.E.2d 597 (1959)); *Generale Bank v. Wassel*, 779 F.Supp. 310, 318 (S.D.N.Y. 1991) ("the Appellate Division routinely affirms grants of summary judgment that rely on an unconditional guarantee and waiver of defenses . . . [and] often reverses the [New York] Supreme Court and grants summary judgment on an unconditional guarantee and waiver of defenses, even though the lower court has discerned disputed issues of fact"); *117-14 Union Turnpike Assocs.*, 187 A.D.2d at 358, 589 N.Y.S.2d at 880 (affirming grant of summary judgment where defenses had been waived by the language of an irrevocable and unconditional guarantee).

■ *Bank Leumi Trust Co. v. D'Evori Int'l., Inc.*, 163 A.D.2d 26, 558 N.Y.S.2d 909 (1st Dep't.1990), is a case on point. In *Bank Leumi*, the court found that the guarantors had waived their right to raise several of their affirmative defenses because of the wide scope of the guaranty. The guaranty in that case stated that the guarantor "irrevoca-

bly and unconditionally" guaranteed payment to the bank and that:

> [n]o invalidity, irregularity or unenforceability of any security therefor shall affect, impair or be a defense to this guaranty, and this guaranty is a primary obligation of the undersigned.

*Id.*, 163 A.D.2d at 34, 558 N.Y.S.2d at 916. Based on that language, the court concluded that the guarantor was "foreclosed from asserting reliance upon any alleged bank representation. . . ." *Id.* The language of the Guaranty in the current case is equally strong; the Guaranty unconditionally binds the guarantors to the obligations arising under the loan agreements and the promissory notes. Accordingly, the Sunas' affirmative defenses are barred because the Guaranty forbids them from relying on promises by bank officials beyond the terms of the Amended Agreement, Replacement Note and Guaranty.

However, even if the language of the Guaranty did not bar the Sunas from raising affirmative defenses, the affirmative defenses they assert would still fail as a matter of law, for the reasons explained below.

### 1. The Alleged Oral Promise to Obtain Life Insurance

The Sunas contend that, as part of the original loan agreement, Old CrossLand made an oral promise to Suna Co. that it would obtain a life insurance policy in Harry Suna's name. According to defendants, that policy, which would have been payable to the owner of the note, would have covered the bank's losses in the event of default after Harry Suna's death in May 1992. The bank's failure to provide the insurance, the Sunas argue, releases the obligors from the agreement. Plaintiff denies that it ever made a promise to obtain a life insurance policy for Harry Suna. Nonetheless, the Sunas' argument fails as a matter of law because this defense is barred by two separate doctrines: the parol evidence rule and the *D'Oench* doctrine, codified at 12 U.S.C. § 1823(e).[6]

---

6. The only evidence offered by the Sunas to support their allegation that Old CrossLand promised to purchase life insurance is the affidavit of

Stanley Wagman, an attorney who represented the Estate of Harry Suna until his own death. The affidavit states, in relevant part:

### a. The Parol Evidence Rule

■ The parol evidence rule bars the introduction of contemporaneous or prior oral statements that tend to alter or supplement the meaning of any written contract that is clear on its face and purports to be the complete expression of the agreement between the parties. *Namad v. Salomon, Inc.,* 74 N.Y.2d 751, 753, 543 N.E.2d 722, 723, 545 N.Y.S.2d 79, 80 (1989); *European American Bank v. Syosset Autorama, Inc.,* 204 A.D.2d 266, 267, 611 N.Y.S.2d 585, 586 (2d Dep't. 1994); *North Fork Bank & Trust Co. v. Bernstein & Gershman,* 201 A.D.2d 472, 472–73, 607 N.Y.S.2d 135, 136 (2d Dep't.1994). Thus, in actions by banks to enforce promissory notes, New York courts have applied the parol evidence rule consistently to bar defenses based upon alleged oral side agreements. *E.g., Bank of Suffolk County. v. Kite,* 49 N.Y.2d 827, 404 N.E.2d 1323, 427 N.Y.S.2d 782 (1980); *American Bank & Trust Co. v. Intermodulex NDH Corp.,* 74 A.D.2d 218, 427 N.Y.S.2d 30 (1st Dep't.1980).

The Amended Agreement states that the written documents constitute the entire agreement between the parties. Paragraph 5.04 of the Amended Agreement states:

> This Amendment together with the Credit Agreement and the exhibits and schedules thereto embodies the entire agreement and understanding between the Bank and Borrower and supersedes all prior agreements and understandings relating to the subject matter hereof.

The language of the Amended Agreement demonstrates that the parties intended to be bound only by written documents. Accordingly, plaintiff argues, evidence of the alleged oral promise to purchase life insurance is barred by the parol evidence rule because such a promise would alter the written agreement.

The Sunas contend that the parol evidence rule does not apply in this case. They argue that when one party has induced the other to rely on an oral modification, that party may be equitably estopped from invoking the requirement of a writing, despite the presence of a "no oral modifications clause" in the written agreement. In support of their position, defendants cite two cases: *Rose v. Spa Realty Assocs.,* 42 N.Y.2d 338, 341, 397 N.Y.S.2d 922, 927, 366 N.E.2d 1279, 1283 (1977), and *U.S. West Financial Servs., Inc. v. Marine Midland Realty Credit Corp.,* 810 F.Supp. 1393, 1405 (S.D.N.Y.1993).

■ *Rose* sets forth the conditions that must be satisfied before a party to a written contract containing a "no oral modifications clause" may introduce evidence of an oral modification. The conditions that must be satisfied are: (1) there must have been a *subsequent* oral modification to an *existing* written agreement; (2) there must be full performance of the oral modification by the party seeking to avoid the requirement of a writing; (3) the acts taken in reliance on the modification must not be compatible with the agreement as written; and (4) if the performance of the modification is partial, such performance must be "unequivocally referable to the oral modification." *Rose,* 42 N.Y.2d at 343, 397 N.Y.S.2d 922, 366 N.E.2d 1279. The present case does not meet those requirements because the Sunas allege that the oral promise on the part of Old Cross-Land was *contemporaneous with* the Original Note and Agreement. As explained above, the parol evidence rule bars contemporaneous or prior oral statements. *Rose* merely allows the court to consider evidence

---

5. During the said telephone conversation with Mr. Murphy, I made a comment about the availability of life insurance proceeds from a life insurance policy presumably purchased by CrossLand on the life of Harry Suna. By virtue of this policy, Crossland would be the beneficiary of life insurance proceeds which would have offset the obligation under a note and guarantee related to the loan, in the event of Harry Suna's death.

6. Mr. Murphy responded to my comment about the availability of lender or creditor life insurance as follows: He indicated his embar-

rassment with "not only this" (i.e., the failure of CrossLand to obtain the aforementioned life insurance policy), but with CrossLand's 'mismanagement of the entire matter.'

The Sunas have offered no direct evidence of the alleged promise, and the Wagman affidavit provides, at best, an indirect reference to any promise to obtain insurance. Whether a reasonable jury could find that such a promise was made, therefore, is questionable. The issue is not reached here because the defense is barred as a matter of law.

of a *subsequent* oral modification to an *existing* written agreement, despite the existence of a "no oral modifications" clause. *U.S. West Financial Servs.*, provides the same analysis as *Rose* and therefore is equally inapplicable. *See U.S. West Financial Servs.*, 810 F.Supp. at 1405 ("[t]he conduct claimed to have been performed in reliance on the oral modification must unequivocally refer to the modification, not the original writing").

Because defendants allege a contemporaneous oral agreement, and not a subsequent oral modification, the cases they cite are inapplicable to the instant case. Neither *Rose* nor *U.S. West Financial Servs.* creates an exception to the parol evidence rule, which thus bars defendants' allegation of a promise to obtain life insurance.

### b. *D'Oench* Doctrine

Defendants' allegation that Old CrossLand agreed to obtain life insurance as part of the Suna Co. loan is also barred by the *D'Oench* doctrine, which has been codified at 12 U.S.C. § 1823(e). The *D'Oench* doctrine, named for the Supreme Court's decision in *D'Oench, Duhme & Co., Inc. v. FDIC*, states that the FDIC and its successors-in-interest cannot be bound by oral agreements that do not appear in the records of a failed bank.

In *D'Oench, Duhme & Co., Inc. v. FDIC*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), the defendant borrower, a securities firm, executed a promissory note in favor of a failing bank. The bank promised the borrower that the note would not be called for payment; it simply wanted to keep the note on its books in order to mislead the banking authorities concerning its assets. When the bank subsequently failed and the FDIC acquired its assets, the Supreme Court held that the defendant was obligated to make payment on the promissory note to the FDIC as a subsequent holder of the note, despite the fact that the bank had made an oral promise to the firm that the note would not be called for payment. The Court held that the firm was estopped from asserting the oral agreement as a defense because it had, "lent [itself] to a scheme or arrangement whereby the banking authority . . . was likely

to be misled." *Id.* at 459, 460, 62 S.Ct. at 680. The debtor's affirmative defense was dismissed despite the fact that the debtor did not intend to deceive the banking authorities; it was sufficient that the firm had played a role in the deceptive scheme.

Subsequent cases have not limited the *D'Oench* doctrine to "secret" agreements or required a "scheme" to mislead or intent to defraud. *See, e.g., FDIC v. Bernstein*, 944 F.2d 101, 108 (2d Cir.1991) ("the *D'Oench* doctrine has been extended through the development of federal common law to apply to situations other than those involving secret agreements"); *FDIC v. McCullough*, 911 F.2d 593, 600–01 (11th Cir.1990) ("neither a claim of lack of intent to deceive banking authorities nor a claim that the purported secret arrangement was not by its nature fraudulent is sufficient to defeat application of the *D'Oench* doctrine"), *cert. denied*, 500 U.S. 941, 111 S.Ct. 2235, 114 L.Ed.2d 477 (1991); *Beighley v. FDIC*, 868 F.2d 776, 784 (5th Cir.1989) (the *D'Oench* doctrine "now applies even when the borrower does not intend to deceive banking authorities"). Rather, the relevant inquiry is whether the agreement appears in writing in the failed bank's records. *See, e.g., FDIC v. Giammettei*, 34 F.3d 51, 55–56 (2d Cir.1994); *Federal Savings and Loan Ins. Corp. v. Griffin*, 935 F.2d 691, 697 (5th Cir.1991), *cert. denied*, 502 U.S. 1092, 112 S.Ct. 1163, 117 L.Ed.2d 410 (1992); *Timberland Design, Inc. v. First Service Bank for Savings*, 932 F.2d 46, 49 (1st Cir.1991) (per curiam); *In re Woodstone Limited Partnership*, 149 B.R. 294, 297 (Bankr.E.D.N.Y.1993).

The rationale behind the *D'Oench* doctrine is that the FDIC must be able to rely on the records of financial institutions in order to protect public funds. *McCullough*, 911 F.2d at 600. Accordingly, the *D'Oench* doctrine favors the interests of the depositors and creditors of a failed bank, who cannot protect themselves from secret agreements, over the interests of the borrowers who can by ensuring that any modification to an agreement is reduced to writing. *Langley v. Federal Deposit Ins. Corp.*, 484 U.S. 86, 91–93, 108 S.Ct. 396, 401–02, 98 L.Ed.2d 340 (1987); *Bell & Murphy and Assocs. v. Interfirst Bank Gate-*

*way, N.A.*, 894 F.2d 750, 754 (5th Cir.), *cert. denied*, 498 U.S. 895, 111 S.Ct. 244, 112 L.Ed.2d 203 (1990); *In re Woodstone*, 149 B.R. at 296.

▮ In 1950, Congress codified the *D'Oench* doctrine at 12 U.S.C. § 1823(e), which, as amended, now reads:

**(e) Agreements against interests of Corporation**

No agreement which tends to diminish or defeat the interest of the Corporation in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the corporation unless such agreement—

(1) is in writing,

(2) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,

(3) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and

(4) has been, continuously, from the time of its execution, an official record of the depository institution.

Thus, under section 1823(e), evidence of an oral side agreement is barred provided that: (1) the alleged oral agreement is an "agreement" within the meaning of the statute; and (2) the agreement tends to "diminish or defeat the interests" of the FDIC. With regard to the first requirement, the Supreme Court held in *Langley v. FDIC*, 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987), that *any* condition to the payment of a note, including a promise to take future action, is an agreement to which the constraints of section 1823(e) attach. *Id.* at 92, 108 S.Ct. at 401. Accordingly, the alleged promise to obtain life insurance is an "agreement" within the meaning of § 1823(e).

Second, it is beyond question that the oral agreement to provide life insurance, assuming such an agreement existed, tended to "diminish or defeat the interests" of the

FDIC because it required the bank, and later the FDIC as its conservator, to pay to obtain a life insurance policy in Harry Suna's name. This alleged obligation imposed a duty upon the bank; the bank's failure to perform could have released the debtor from its obligation. Accordingly, this alleged promise clearly tended to "diminish or defeat the interests" of the FDIC.

Finally, the protections of *D'Oench* and section 1823(e) are extended to New CrossLand as the successor-in-interest to the FDIC. *FDIC v. Newhart*, 892 F.2d 47, 49–50 (8th Cir.1989); *Woodstone*, 149 B.R. at 297; *Santopadre v. Pelican Homestead and Savings Ass'n*, 782 F.Supp. 1138, 1142 (E.D.La.), *aff'd*, 977 F.2d 577 (5th Cir.1992); *Adams v. Madison Realty & Dev., Inc.*, 746 F.Supp. 419, 430 (D.N.J.1990), *aff'd*, 937 F.2d 845 (3d Cir.1991).

Accordingly, section 1823(e) applies to bar evidence of the alleged oral agreement to obtain a life insurance policy for Harry Suna.

2. *Release from the Obligations of the Guaranty*

▮ As an additional affirmative defense, the Sunas contend that New CrossLand altered the loan agreement in March 1992, and that this change created a new agreement and thereby released the guarantors from their obligations under the guaranty. The burden of establishing the existence of a material issue of fact lies with the Sunas because they would have the evidentiary burden at trial of proving that a modification took place. *Anderson v. Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. at 2510. Accordingly, the Sunas must offer evidence that the loan agreement was altered and that this alteration discharged the guarantors from their obligations under the Guaranty.

The Sunas rely on two documents in asserting this defense: (1) the minutes of the March 18, 1992 New CrossLand executive board meeting, and (2) a fax sent from New CrossLand Vice-President Tom Murphy to Harry Suna dated March 24, 1992. As explained above, the New CrossLand minutes authorized Mr. Murphy to offer Suna Co. certain terms for restructuring the loan

agreement. The minutes proposed that the loan be extended for a term of one year, that the interest rate be increased, and that $30,-000 be added to the principal on the loan. The fax from Mr. Murphy to Harry Suna incorporated some of those terms and included a proposed amortization schedule for the restructured loan.[7] Based solely on these two documents, defendants contend that the loan agreement was altered such that a new agreement was formed and they were discharged from their obligations under the Guaranty.

### a. *Modification of the Loan Agreement*

The Amended Agreement contains what is commonly referred to as a "no oral modifications" clause. Specifically, section 5.04 of the Amended Agreement states:

> No modification or waiver ... shall in any event be effective unless it shall be in writing and signed by the Bank. ...

New York courts generally enforce such clauses. *See, e.g., CrossLand Savings, FSB v. Loguidice–Chatwal Real Estate Inv. Co.,* 171 A.D.2d 457, 567 N.Y.S.2d 39 (1st Dep't 1991); *City of New York v. Grosfeld Realty Co.,* 173 A.D.2d 436, 437, 570 N.Y.S.2d 61, 62 (2d Dep't.1991); *Merrill Lynch Realty Assocs., Inc. v. Burr,* 140 A.D.2d 589, 593, 528 N.Y.S.2d 857, 860 (2d Dep't.1988). In addition, New York General Obligations Law § 15–301 states:

> a written agreement ... which contains a provision to the effect that it cannot be changed orally, cannot be changed by an executory agreement unless such agreement is in writing and signed by the part against whom enforcement of the change is sought or by his agent.

Accordingly, if their defense is to create a triable issue of fact as to whether the loan agreement was modified, the Sunas must produce evidence of a written modification agreement that was signed by an officer of the Bank.

The Sunas do not contend that the parties executed a formal agreement to modify the loan agreement; rather, they argue that the New CrossLand minutes, in conjunction with the Murphy fax, formed a new agreement that binds the parties.[8] Although contracts can sometimes be enforced based on informal or incomplete writings, where the parties have demonstrated an intent not to be bound until they have executed a formal contract, they cannot be bound until the writing is complete. *Reprosystem, B.V. v. SCM Corp.,* 727 F.2d 257, 261 (2d Cir.) (*citing V'Soske v. Barwick,* 404 F.2d 495, 499 (2d Cir.1968), *cert. denied,* 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454 (1969)), *cert. denied,* 469 U.S. 828, 105 S.Ct. 110, 83 L.Ed.2d 54 (1984). Whether the March 1992 documents contractually bind the parties, therefore, revolves around the issue of intent. The Second Circuit has identified four factors that are to be considered in determining whether the parties intended to be bound without a docu-

---

**7.** Significantly, the amortization schedule did not include the $30,000 addition to the principal mentioned in the March 18, 1992 New Cross-Land minutes.

**8.** As stated above, the Sunas offer no contract or other writing that has been executed by both parties, and the Sunas do not argue that the March 18, 1992 minutes constitute a signed writing. Therefore, the Sunas must rely on the fax as a signed writing; otherwise, their defense is barred by the terms of the Guaranty and General Obligations Law § 15–301.

If Mr. Murphy intended the word "Tom" to carry the effect of his signature, then it constitutes a signing regardless of the fact that Mr. Murphy used only his first name. *Pearlberg v. Levisohn,* 112 Misc. 95, 98, 182 N.Y.S. 615, 617 (2d Dep't.1920) (cross mark, initials, typewritten name or even numbers may constitute signature if intended as such, establishing rule that "any name or symbol used by a party with the intention of constituting it his signature ... is sufficient"); *Wagner v. Chemical Bank & Trust Co.,* 154 Misc. 123, 125, 276 N.Y.S. 717, 719 (Mun. Ct., New York Cty.1934) ("Exactly what constitutes a signing has never been reduced to judicial formula;" thus whatever is intended as a signature is "a valid signing, no matter how imperfect or unfinished"). A jury could find, therefore, that the word "Tom" was intended as a legal signature.

Although the court finds it extremely unlikely that a reasonable jury would reach the conclusion that the fax constitutes a signed writing, that issue is not resolved here; the court assumes that the fax constitutes a signed writing because it must resolve all possible inferences in favor of the party opposing summary judgment. *Meiri v. Dacon,* 759 F.2d 989, 997 (2d Cir.), *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985).

ment executed by both parties. The court is to consider:

> (1) whether there has been an express reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing.

*Winston v. Mediafare Entertainment Corp.*, 777 F.2d 78, 80 (2d Cir.1985).

The first criterion is of no help here. Although New CrossLand required in its pre-negotiation letters that all agreements be formalized by "definitive documentation," New CrossLand did not draft those letters until *after* the CrossLand minutes and the Murphy fax were created. The pre-negotiation letters therefore could not constitute an express reservation of the right not to be bound, since defendants argue that New CrossLand and Suna Co. created a new agreement before the pre-negotiation letters were sent.

However, the remaining *Winston* criteria suggest that the parties were not, and did not intend to be, bound by the documentation created by New CrossLand in March 1992. The Sunas offer no evidence of partial performance, which *Winston* lists as a critical indicator of whether the parties intended to be bound by a proposed agreement or modification. The proposal and amortization schedule contained in the New CrossLand minutes called for monthly payments of $40,000; there is no evidence that Suna Co. made such payments.[9] The continuing negotiations between Suna Co. and New CrossLand confirm that the parties were not performing the modified agreement as set forth in the New CrossLand minutes and the Murphy fax. To the contrary, the parties extended their negotiations through July 1992, as the pre-negotiation letters and the June 15, 1992 negotiations memo establish.

Consideration of the third criterion, *i.e.,* whether the parties had settled all of the terms of the agreement, also suggests that the parties did not intend to be bound by the fax and the New CrossLand minutes. The documents offered by the Sunas provide conflicting information concerning the size of the principal on the restructured loan agreement. While the minutes of the New CrossLand meeting state that an additional $30,000 would be added to the principal, the amortization schedule attached to the fax does not reflect this change.[10]

Finally, the type of agreement involved in this case is the kind of accord in which parties ordinarily insist on creating a formal written document before being bound. In *Reprosystem*, the Court of Appeals relied on the "complex" commercial nature of the transaction in question to find that the parties had intended not to be bound until a formal contract was executed. That case involved a sale of six companies for $4 million; the present case involves a business loan in the amount of $3 million plus interest. In both cases, the magnitude and commercial nature of the transaction create a practical business need to insure that all agreements are recorded in definitive documents. *See Reprosystem*, 727 F.2d at 262–63. The nature of the transaction thus suggests that the parties did not intend to be bound by the

---

9. In his affidavit in opposition to plaintiff's motion for summary judgment, sworn to April 11, 1995, Alan Suna states: "[i]t is my understanding that two (2) payments, of $19,375.00 (on April 13, 1992) and $19,859.18 (on July 8, 1992), were made per the new Agreement." Affidavit of Alan Suna at ¶ 18. However, defendant has provided no documentation of such payments and, even assuming such payments were made, the Executive Committee minutes for March 18, 1992 show that the Committee approved a proposed restructuring of the loan with interest and principal to be repaid at the rate of $40,000 per month. Accordingly, the alleged payments of less than $20,000 each in April and July of 1992 are not evidence of partial performance under the restructured loan, but could demonstrate partial performance under the Amended Agreement. Regardless, as explained above, the remaining *Winston* factors are not satisfied.

10. The negotiation memo between Mr. Murphy and Stuart Suna, dated June 15, 1992, does call for an additional $30,000 to be applied to the principal.

New CrossLand minutes and the Murphy fax.[11]

Under the criteria set forth in *Winston*, therefore, New CrossLand did not intend to be bound by the New CrossLand minutes and the Murphy fax, which were clearly negotiation proposals rather than manifestations of an entire agreement. Accordingly, the Sunas have not met their burden of providing sufficient evidence to demonstrate that the amended agreement was modified in March 1992 or that a new agreement was created.

b. Even if the Amended Agreement were Modified, that Modification did not Discharge the Guarantors from their Obligations under the Guaranty.

The Sunas advance two theories to support their contention that the alleged alteration of the Amended Agreement released them from their obligations as guarantors. First, the Sunas argue that what actually took place in March 1992 was not a modification of the existing agreement but the creation of a new term loan, to which the Guaranty did not apply. Relying on *Miles v. Houghtaling*, 32 A.D.2d 714, 715, 300 N.Y.S.2d 5, 7 (3d Dep't. 1969), which held that the creation of a new agreement to take the place of a prior agreement extinguishes all obligations arising under the prior agreement, the Sunas argue that they are not liable for any debts under the new term loan. Second, the Sunas argue that the advance consent clause in the Guaranty, pursuant to which they agreed in advance to all modifications, is not applicable here because it was not intended to apply to a subsequent restructuring of the credit line.

The Sunas' first argument, namely that the March 1992 minutes and fax created a new loan agreement, is meritless. The Sunas concede that, with the exception of the time for payment and the rate of interest, the material terms of the loan remained the same. *See Regency Equities Corp. v. Reiss,* 1995 WL 362496, at *2 (S.D.N.Y. June 16, 1995) (where interest rate and date of payment were altered but remedies of creditor and amount of principal remained the same, change was modification rather than creation of new agreement).

More importantly, the distinction between the creation of a new contract and the modification of a previously existing contract is a meaningless one because both serve to release the guarantor from liability absent an advance consent provision. In a case strikingly similar to this one, *Banco Portugues do Atlantico v. Asland, S.A.,* 745 F.Supp. 962, 969 (S.D.N.Y.1990), the defendant guarantor made the same argument that the Sunas attempt to advance here. Rejecting the argument, the court stated:

[a] review of the relevant New York case law demonstrates that defendant's implicit distinction between an "alteration" of a guaranteed contract on the one hand, and a "new" contract wholly outside of the guaranteed contract on the other, is analytically unsound. Instead, every modification which operates to release a guarantor does so precisely *because* it creates a "new" or "different" contract which alters the guarantor's undertaking.

The distinction that the Sunas attempt to make between a new contract and a modified contract fails because it ignores the fact that in either case the resulting agreement arises from the alteration of a prior agreement. The Sunas' argument that they have been released from the Guaranty turns not upon the degree or type of modification but upon whether the Sunas have consented to the changes in the Amended Agreement that they allege took place in March 1992.

As the Sunas point out, the modification of a loan agreement without the consent of the guarantors discharges the guarantors from their obligations, even where the principal debtor has consented to the modification and the modification is not material. *Bier*

---

**11.** The *D'Oench* doctrine reinforces the need for a complete, definitive writing. As *Langley* states, the doctrine is designed to insure that banks keep accurate and complete records of their transactions and assets; putting agreements into fully executed contracts is the only way to protect borrowers and insure that banking officials can assess accurately the assets and liabilities of a financial institution. *See Langley,* 484 U.S. at 87, 108 S.Ct. at 399. As a result, *D'Oench* suggests that the Suna Co. loan, as well as any modification, is precisely the kind of agreement that is customarily set forth in a formally executed agreement.

*Pension Plan Trust v. Estate of Schneierson,* 74 N.Y.2d 312, 315, 545 N.E.2d 1212, 1214, 546 N.Y.S.2d 824, 826 (1989). *See also Regency Equities Corp. v. Reiss,* 1995 WL 362496, at *2 (S.D.N.Y. June 16, 1995) ("Ordinarily, guarantors are not liable for the alterations or modifications of the contracts which underlie their agreements"); *National Westminster Bank U.S.A. v. Ross,* 676 F.Supp. 48, 51–52 (S.D.N.Y.1987) (" 'Any alteration in [a] loan made without the consent of the guarantor, whether or not material, operates as a discharge' ") (*quoting Depositors Trust Co. v. Hudson Gen'l Corp.,* 485 F.Supp. 1355 (S.D.N.Y.1980)); *Hall & Co. v. Continental Casualty Co.,* 34 A.D.2d 1028, 1029, 310 N.Y.S.2d 950, 952 (3d Dep't.1970) (any alteration of the contract to which guaranty applies, whether material or not, serves as a discharge of the guarantor). In *Bier Pension Plan Trust,* the New York Court of Appeals explained that guarantors cannot be bound where the creditor and debtor have substituted an agreement and obligations to which the guarantors have not consented as part of the executed guaranty. To bind the guarantors to obligations that were created in the absence of their consent would subject guarantors to unfair and unacceptable risks, since the creditor and debtor could obligate the guarantor far beyond the scope of the original loan agreement. *Bier Pension Plan Trust,* 74 N.Y.2d at 315, 545 N.E.2d at 1214, 546 N.Y.S.2d at 826. Accordingly, if the Suna Co. loan was modified without the consent of guarantors Harry and Alan Suna, the guarantors are discharged from their obligations under the Guaranty.

■ However, the guarantors of a loan agreement may consent to modifications in advance. Under New York law, a guarantor's advance consent to modifications is valid and enforceable. *See Bank of New York v. CMS Funding, Ltd.,* 201 A.D.2d 602, 603, 608 N.Y.S.2d 476, 477 (2d Dep't.1994); *Republic Nat'l Bank of New York v. Haddad,* 121 A.D.2d 986, 988, 504 N.Y.S.2d 669, 671 (1st Dep't.1986). *See also Regency Equities Corp.,* 1995 WL 362496, at *2. The Guaranty executed by the Sunas contains this type of provision. Paragraph 3 of the Guaranty states:

Each of the guarantors consents that without the necessity for any additional endorsement or guarantee of the Obligations or any reservation of rights against either or both of the Guarantors, and without notice to or further assent of either or both of the Guarantors ... the liability of the Borrower ... may, from time to time, in whole or in part, be increased, renewed, extended, modified, amended, compromised or released by the Bank ... all without impairing, abridging, affecting, diminishing or releasing the Obligations or the liabilities of each Guarantor hereunder.

Any changes or modifications that fall within this paragraph cannot release the guarantors from their obligations under the Guaranty because the guarantors consented to such alterations when they executed the Guaranty. Whether the guarantors were released from their obligations, therefore, depends upon whether the alleged changes fall within the scope of the consent provision of the Guaranty.

■ As explained above, the Sunas argue that the advance consent clause was not intended to extend to a subsequent restructuring of the credit line. However, where the intent of the parties can be determined from the face of the contract, the court must enforce the unambiguous goals of the document. Summary judgment is appropriate when the meaning of the contract is evident. *Garza v. Marine Transport Lines, Inc.,* 861 F.2d 23, 27 (2d Cir.1988) (mere assertion that contract is ambiguous is insufficient to withstand summary judgment.); *Tucker Leasing Capital Corp. v. Marin Medical Mgt., Inc.,* 833 F.Supp. 948, 956 (E.D.N.Y.1993) ("Rather than rewrite an unambiguous agreement, a court should enforce the plain meaning of the agreement."); *New Bank of New England, N.A. v. Toronto–Dominion Bank,* 768 F.Supp. 1017, 1022 (S.D.N.Y.1991) ("Where ... the meaning of an agreement among sophisticated parties is unambiguous on its face, the agreement does not become ambiguous simply because one of the parties later asserts that it intended a different interpretation.... Nor should the court read an ambiguity into an agreement merely because one of the parties becomes

dissatisfied with its position under the plain terms of the agreement.") (*citing Libra Bank Limited v. Banco Nacional de Costa Rica, S.A.*, 570 F.Supp. 870, 893 (S.D.N.Y.1983) ("where there is no inherent ambiguity, courts should not ... reach an artificial interpretation in order to relieve a party from an improvident bargain")). In contrast, where the language of the agreement is not clear, the non-moving party can avoid summary judgment by offering a plausible interpretation which, if accepted by a reasonable jury, would free that party from its obligations under the agreement. *See Caldor, Inc. v. Mattel, Inc.*, 817 F.Supp. 408, 411 (S.D.N.Y.1993) (denying motion for summary judgment because both sides had offered plausible interpretations of ambiguous contract). Thus, if the language of the Guaranty unambiguously covers the alleged modifications, then the Sunas are bound by the advance consent clause.

■ Courts interpreting guarantees with language similar to that in Paragraph 3 of the Guaranty have found that the clause unambiguously relates to any and all modifications to the underlying loan agreement. Indeed, the language contained in this Guaranty is at least as broad and inclusive as the language of the guaranty on which the plaintiff relied in *Banco Portugues*, 745 F.Supp. at 969. In granting summary judgment in that case, the court found that the guarantor-defendant had consented in advance to all future modifications. The guaranty in *Banco Portugues* stated:

*4. Obligations Absolute.* The obligations of each guarantor under this Guarantee shall be absolute and unconditional and shall remain in full force and effect ... notwithstanding the lack of any notice to, reservation of rights against or further assent of any Guarantor: ... (e) the modification or amendment (whether material or otherwise) of any of the Obligations, or the terms of any other guarantee, the Loan Agreement, the Line of Credit, or any Other Agreement....

*Id.* The court in *Banco Portugues* found this language sufficiently broad to encompass any modification made to the underlying loan agreement.

The Guaranty in the present case is also substantially similar to the guaranty in *Regency Equities Corp.* The guaranty in that case contained a clause stating:

The Guarantors agree that their respective liabilities hereunder shall be unaffected, regardless of whether notice is given or their further consent obtained, by any amendment, supplement, extension, renewal, modifications or other change in the provisions of the Note, the Mortgage, or any other instrument made to or with the Lender by the Borrower....

*Regency Equities Corp.*, 1995 WL 362496, at *2. The modification in that case was substantially similar to the alleged modification in the present case; the term of the credit agreement had been extended and the interest rate changed. The court granted summary judgment against the guarantor, holding that the modifications fell within the scope of the advance consent clause. *See also Banque Worms v. Andre Cafe Ltd.*, 183 A.D.2d 494, 494, 583 N.Y.S.2d 438, 439 (1st Dep't.1992) (extension of time for payment of loan fell within scope of consent in guaranty). Accordingly, the broad language of the advance consent clause in this case, combined with the relatively minor nature of the changes, suggests that the modifications fall within the scope of the Guaranty's advance consent clause.

Other aspects of the Guaranty confirm this result. The first paragraph of the Guaranty asserts that it is broad in scope, as it states:

1. Each of the Guarantors hereby jointly and severally guarantee to the Bank the prompt and unconditional payment of each and every obligation and liability of the Borrower to the Bank, now existing or hereinafter incurred, including, without limitation, all obligations and liabilities of the Borrower under, *arising from or relating to the Agreement* and the Note, together with any and all costs and expenses which may be incurred by the Bank in enforcing the obligations of the Borrower under the Agreement and the Note and the obligations of each of the Guarantors hereunder. (emphasis added)

The modifications alleged by the Sunas clearly "aris[e] from or relat[e] to the Agreement." The principal on the term loan proposed by the New CrossLand minutes was derived directly from the three million dollar value of the credit agreement created by the Amended Agreement and the Replacement Note. Furthermore, the minutes state that New CrossLand was proposing an "extension" of an existing loan, not the creation of a new one. Under any plausible interpretation, the alleged modifications arise from and relate to the credit agreements.

The Guaranty continues to speak in broad, inclusive terms, as Paragraph 2 characterizes the Guaranty as a "continuing, unlimited, absolute and unconditional guarantee of payment of the Obligations. . . ." This sweeping language leads to the inevitable conclusion that the alleged modifications are within the unambiguous scope of the advance consent clause of the Guaranty. Accordingly, this court cannot interpret the Guaranty in any way other than to conclude that the alleged modifications were within the scope of the consent clause. *See Marine Midland Bank v. Smith,* 482 F.Supp. 1279, 1291 (S.D.N.Y. 1979) ("conversion of the terms of a bank loan from safeguards for the lender into a shield for the guarantors will seriously disrupt important commercial needs and understanding"), *aff'd,* 636 F.2d 1202 (2d Cir.1980). Thus, even if the Sunas were able to establish that the parties intended to be bound by the terms of the New CrossLand minutes and the Murphy fax, they remain liable under the promissory note and the Amended Agreement because they consented to any modification in the loan agreement at the time they executed the Guaranty.

## C. The Bankruptcy Stay

▮▮▮▮ As a final affirmative defense, the Sunas point out that a bankruptcy petition was filed against Suna Co. on May 21, 1993. That petition was later converted to a Chapter 11 bankruptcy petition on July 19, 1993. The Sunas argue that the automatic stay of proceedings against debtors in bankruptcy cases created by 11 U.S.C. § 362 confers immunity from suit upon them and precludes summary judgment in this case. That argument is without merit. A bankruptcy stay against a corporation does not affect the obligations of or actions arising from the obligations of non-bankrupt guarantors. *Golden v. Moscowitz,* 194 A.D.2d 385, 385, 598 N.Y.S.2d 522, 523 (1st Dep't.1993); *Centrust Servs., Inc. v. Guterman,* 160 A.D.2d 416, 418, 554 N.Y.S.2d 113, 113 (1st Dep't 1990). As a result of the bankruptcy proceedings, New CrossLand has elected to pursue only its claims against the guarantor at this time. The stay of proceedings created by 11 U.S.C. § 362, therefore, does not affect this case and cannot be used as an affirmative defense by the Sunas.

Accordingly, New CrossLand is entitled to summary judgment with respect to the liability of guarantors Alan Suna and Harry Suna because it has met its evidentiary burden and the Sunas have failed to offer a valid affirmative defense.

## 3. Damages

It is undisputed that Suna Co. and its guarantors remain obligated for three million dollars, the full value of the Replacement Note. The Sunas and Suna Co. have offered no evidence that any of the principal has been paid, nor have they argued to that effect. In addition, New CrossLand is entitled to interest dating from June 1, 1992.[12] Nonetheless, the exact amount owed to New CrossLand by the Sunas cannot be ascertained until judgment is entered in this case.[13]

Moreover, the guarantors are liable for New CrossLand's attorneys' fees. Paragraph 1 of the Guaranty states that the guarantors are liable for, "any and all costs and expenses which may be incurred by the Bank in enforcing the obligations of the Bor-

---

12. In its July 23, 1992 letter of demand for payment by its attorneys at the time, Zeichner Ellman & Krause, New CrossLand submits that it is entitled to a per diem interest rate of $916.67, which translates into an annual yield of 11% interest.

13. Of course, all documented payments, if any, should be deducted from the total in calculating the amount of the final judgment.

rower under the Agreement and the Note and the obligations of each of the Guarantors hereunder." Accordingly, plaintiff should be directed to submit documentation of its reasonable attorney's fees and costs incurred in bringing this action.

### Conclusion

For the reasons stated below, the undersigned respectfully recommends that summary judgment be granted in favor of plaintiff.

Objections to this report and recommendation must be filed within ten (10) days of receipt to preserve appellate review. *See* 28 U.S.C. § 636(b)(1).

Dated: Brooklyn, New York

September 29, 1995