EMI MUSIC MARKETING (f/k/a EMI Music Distribution), a division of Capitol Records, Inc., Plaintiff,

v.

AVATAR RECORDS, INC. and Larry Robinson, Defendants.

No. 03 CIV. 2783(VM).

United States District Court, S.D. New York.

May 5, 2004.

Michael S. Elkin, Shari H. Markowitz, Shari Markowitz Savitt, Thelen, Reid & Priest, L.L.P., New York, NY, Rebecca Calkins, Thelen, Reid & Priest, L.L.P, Los Angeles, CA, for Plaintiff.

Paul A. Chin, Law Offices of Paul A. Chin, New York, NY, for Defendants.

### DECISION AND ORDER

MARRERO, District Judge.

Plaintiff EMI Music Marketing ("EMI"), a distributor of recorded music, brings this action for breach of contract and account stated against Avatar Records, Inc. ("Avatar"), a music production company, and Avatar's president, Larry Robinson ("Robinson" and together with Avatar, the "Defendants"). Avatar has brought counterclaims for breach of contract, breach of the implied covenant and fair dealing, and unfair competition. The dispute revolves around a contract by which EMI agreed to distribute recorded music that Avatar produced. EMI has filed a motion for summary judgment on all of its claims and Defendants' counterclaims. For the reasons discussed below, EMI's motion is granted in part and denied in part.

## I. FACTS AND PROCEEDINGS

EMI distributes recorded music in forms such as compact discs and cassettes. Avatar is an independent record company that produces recorded music for distribution.

EMI and Avatar entered into a three-year distribution agreement dated January 1, 2000 (the "Distribution Agreement"), pursuant to which EMI became the exclusive distributor in the United States of recorded audio and audiovideo materials ("Records") that Avatar produced. As relevant to the present case, among its duties under the Distribution Agreement Avatar is responsible for "the advertisement, promotion and merchandising" of all its Records. (Distribution Agreement at § 5(g), attached as Ex. C. to Declaration of Rebecca Lawlor Calkins dated March 22, 2004 ("Calkins Dec.").) EMI's relevant responsibilities under the Distribution Agreement include "[s]oliciting sales" of Avatar's Records to EMI's customers; warehousing and shipping Avatar's inventory; and accepting and processing returned items. (*Id.* at § 6(a).)

As payment for its services, EMI was to receive a distribution fee in the form of a percentage of net sales of Avatar's Records during each year of the Distribution Agreement. EMI also was entitled to charge Avatar for each unit that retailers returned to EMI and for each slow-moving unit of inventory. The Distribution Agreement allowed EMI to deduct from sales a reserve which it could apply towards any amount due from Avatar. As additional security for Avatar's payment of these fees, the Distribution Agreement provided that EMI would obtain a security interest in all of Avatar's inventory of Records, master recordings, artists' contracts, and other Avatar assets. Finally, Robinson "irrevocably and unconditionally guarantee[d] the full payment and performance of

all obligations of Avatar Records, Inc." under the Distribution Agreement. (*Id.* at § 22(i).) The Distribution Agreement provides that it "may only be altered by an instrument in writing, executed by authorized officers of all of the parties." (*Id.*)

In January 2001, Avatar released and EMI distributed an album titled "Oz" (the "Oz Album"), a compilation of music inspired by the television series "Oz." Avatar obtained a bank loan to fund its advertising and marketing campaign for the Oz album. In April 2001, Avatar requested that EMI lend or advance to Avatar $435,000, which it needed to pay off the existing bank loan. Avatar indicated that it would repay EMI from a pending bank loan.

By a written amendment to the Distribution Agreement dated April 27, 2001 (the "Amendment"), EMI agreed advance Avatar $435,000. Under the Amendment, Avatar agreed to repay $200,000 before June 15, 2001, with interest to accrue as of June 1, 2001, and EMI would withhold from the reserves established in the Distribution Agreement the remaining $235,000 and any unpaid amounts from the $200,000. All terms of the Distribution Agreement, including Robinson's personal guarantee, applied to the Amendment.

Neither Avatar nor Robinson paid EMI the amount owed by June 15, 2001. In a letter dated September 13, 2001, EMI notified Avatar that it was applying the entire Avatar reserve account of $788,098 towards Avatar's balance of $1,349,479.57, which reflected the $435,000 advance and other amounts Avatar owed EMI pursuant to the Distribution Agreement. EMI demanded that Avatar notify it by October 1, 2001 of how it intended to repay the remaining balance of $561,381.57. In response to this letter, Avatar acknowledged its debt and presented EMI with a repayment plan.

From February 2000 through July 2003, Avatar received monthly account statements from EMI. Robinson or another individual at Avatar reviewed the statements on Avatar's behalf when they were received. Defendants never objected to the accuracy of any of the monthly statements. Defendants also never repaid any portion of the balance to EMI.

In July 2002, Robinson proposed a restructuring of the Distribution Agreement which would enable Avatar to pay its balance to EMI and extend the Distribution Agreement for one year. In September 2002, Giulio Proietto ("Proietto"), EMI's vice president of finance, informed Robinson during a series of telephone calls that EMI's chief financial officer and president had both approved the restructuring proposal, including the one-year extension of the Distribution Agreement. No writing was exchanged between EMI and Avatar extending the Distribution Agreement.

In the late summer of 2002, Avatar and EMI prepared for the scheduled October 8, 2002 release of an album entitled "National Vinyl Association—Straight from the Crates Vol. 1" (the "NVA Album"). Robinson met with EMI sales and marketing staff to discuss promotion of the NVA Album, and Avatar made expenditures to promote and market the NVA Album.

In September 2002, EMI's marketing staff, with Defendants' consent, moved the release date of the NVA Album to January 2003. Between January 2002 and September 2002, Avatar and EMI had released three singles from the NVA Album in advance of the release of the complete album. On November 1, 2002, one of those singles reached number one on the hip-hop college radio chart of the music industry magazine "Urban Network." Robinson reported this development to EMI's vice president of sales and marketing, Ronn Werre ("Werre"), who asked his staff to collect

information about the song to maximize its success. Another EMI executive instructed EMI's regional directors, major accounts staff, and Urban Team on November 5, 2002 to monitor the third single from the upcoming NVA Album. On November 14, 2002, Jennifer McDaniels ("McDaniels"), an EMI senior urban marketing executive, met with two Avatar marketing consultants, Bob Grossi ("Grossi") and Brian Shafton ("Shafton") to continue discussions for the marketing of the NVA Album, and emailed a summary of the discussions to Werre. Avatar continued to spend funds on a marketing and advertising campaign designed around a January 28, 2003 release date for the NVA Album. Avatar claims to have spent approximately $150,000 on that marketing drive. For reasons explained below, EMI never distributed the NVA Album for Avatar. Avatar ultimately entered into an agreement with another distributor and the album was released in June 2003.

During the fall of 2002, at the same time that EMI and Avatar were planning the release of the NVA Album, the parties began discussing a new promotional campaign for the Oz Album to coincide with a new season of the Oz television show, which was scheduled to premiere on January 6, 2003. Grossi and Shafton met with Werre and McDaniels on September 30, 2002 to devise a marketing strategy for the Oz Album, and over the next several months they and other members of the marketing staff from EMI and Avatar exchanged ideas and suggestions to increase sales of the Oz Album. By November 14, 2002, Werre had agreed to include the Oz Album in EMI's catalog restocking program, and EMI sales staff was instructed to promote the album as part of any upcoming retail programs such as Black History Month in February 2003.

While EMI's marketing staff was spending the fall of 2002 developing plans for promoting the NVA and Oz albums in early 2003, EMI's senior legal and business executives continued to demand that Defendants pay EMI its balance owed of $1,131,860.96. In a letter to Robinson dated November 13, 2002, Dina Hellerstein ("Hellerstein"), EMI's vice president for legal and business affairs, indicated that EMI was prepared to exercise its right to terminate the Distribution Agreement or let it expire naturally on December 31, 2002, and pursue legal options for the balance owed. Hellerstein made a formal demand on behalf of EMI for prompt partial payment of $300,000. On November 26, 2002, Hellerstein sent an email to Robinson stating "[w]e received from Avatar the new release sheet on NVA for the January 28, 2003 New Release Book. As you know, our deal ends on December 31, 2002 and we have not yet agreed to extend it. We therefore cannot include NVA in the book." (Email dated Nov. 26, 2002 from Hellerstein to Robinson, attached as Exh. 10 to Declaration of Larry Robinson dated April 6, 2004 ("Robinson Dec.").) In her email, Hellerstein also indicated she had not yet received a response to her November 13 letter.

Avatar's then-counsel Denis Kellman ("Kellman") responded to Hellerstein on December 4, 2002 by stating that "Avatar has never wavered in its willingness to fulfill its financial obligations to EMI." (Letter dated December 4, 2002 from Kellman to Hellerstein (the "Dec. 4 Letter"), attached as Exh. N to Calkins Dec.) In the letter, Kellman indicated that Proietto had informed Robinson during the Summer of 2002 that EMI's president had approved a one-year extension of the Distribution Agreement as part of Avatar's plan to repay its debt to EMI. Kellman's letter also stated that "[r]elying upon the fact that an agreement had been reached between EMI and Avatar with respect to the modified Avatar [repayment] Plan, Mr.

Robinson continued to expend considerable time, money and effort readying Avatar's new releases." (*Id.*) Kellman then wrote that "Avatar continues to be very excited about its 2003 release schedule and is very much desirous of moving ... forward with EMI and making EMI whole." (*Id.*)

Between December 20, 2002 and February 5, 2003, Avatar and EMI exchanged a series of proposals and counter-proposals aimed at reaching an agreement for Avatar to pay off its balance to EMI and continuing the business relationship between the parties. In the last proposal provided in the record, a letter from Hellerstein to Kellman dated February 5, 2003, Hellerstein wrote "I think the parties are very close and we hope to quickly resolve the outstanding issues." (Letter dated Feb. 5, 2003 from Hellerstein to Kellman, attached as Exh. R to Calkins Dec.) Hellerstein's optimism was apparently misplaced, however, for on April 9, 2003 she wrote to Robinson and stated that "[b]ecause [EMI] has come to the point where we think such negotiations are no longer fruitful, as of April 1, 2003, [EMI] will no longer distribute the Avatar Records catalog." (Letter dated April 9, 2003 from Hellerstein to Robinson, attached as Exh. L to Calkins Dec.)

This litigation followed. EMI brought claims against Avatar for an account stated, breach of contract, and foreclosure of security interest, and against Robinson individually for breach of the guaranty clause of the Distribution Agreement. EMI seeks damages in the amount of $1,136,160.71 plus interest and attorneys' fees. Avatar cross-claimed for breach of written contract, breach of oral contract, breach of the implied covenant of good faith and fair dealing, unfair competition, and rescission. Avatar seeks damages in the amount of $2 million plus interest and attorneys' fees, an order rescinding the Distribution Agreement, and punitive damages for what it describes as EMI's "willful, malicious and oppressive conduct." (Amended Answer to Complaint Adding Counterclaims, dated June 23, 2003, at 18.)

## II. *DISCUSSION*

### A. *STANDARD OF REVIEW*

The Court will grant summary judgment to the moving party "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Blouin ex rel. Estate of Pouliot v. Spitzer,* 356 F.3d 348, 356 (2d Cir.2004).

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To survive a motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Instead, the non-moving party must present "specific facts showing that there is a genuine issue for trial." *Id.* at 587, 106 S.Ct. 1348. In deciding a motion for summary judgment, the Court will construe all the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. *See Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998). Nevertheless, "[c]onclusory allegations, conjecture, and speculation" cannot establish a genuine issue of fact for trial. *Id.*

### B. *ACCOUNT STATED*

██ EMI brings a claim for account stated against Avatar. Under New York

State law, which the Distribution Agreement establishes as controlling,[1] an account stated "is an account, balanced and rendered, with an assent to the balance either express or implied." *Abbott, Duncan & Wiener v. Ragusa*, 214 A.D.2d 412, 625 N.Y.S.2d 178 (App. Div. 1st Dep't 1995). If a party receives a statement of balance owed and does not object within a reasonable time, then that party is bound by that account "unless fraud, mistake or other equitable considerations were shown." *Rosenman Colin Freund Lewis & Cohen v. Neuman*, 93 A.D.2d 745, 461 N.Y.S.2d 297, 299 (App. Div. 1st Dep't 1983); *Lankler Siffert & Wohl LLP v. Rossi*, 287 F.Supp.2d 398, 407 (S.D.N.Y. 2003); *Kramer, Levin, Nessen, Kamin & Frankel v. Aronoff*, 638 F.Supp. 714 (S.D.N.Y.1986).

It is undisputed that Avatar received monthly account statements from EMI from February 2000 through July 2003, and that Robinson or another individual reviewed the statements on Avatar's behalf when they were received. Avatar never objected to the accuracy of any statement. To the contrary, Avatar repeatedly acknowledged the amount it owed EMI and reported that it intended to pay the full amount. The December 4 Letter to EMI stated that "Avatar has never wavered in its willingness to fulfill its financial obligations to EMI.... Avatar continues to be very excited about its 2003 release schedule and is very much desirous of moving ... forward with EMI and making EMI whole." (Dec. 4 Letter.)

Summary judgment for EMI will therefore be appropriate unless Avatar can establish a genuine issue of material fact as

to the existence of fraud, mistake or other equitable considerations.

Avatar's filings, read liberally, appear to argue that equitable considerations should prevent summary judgment on EMI's account stated claim. Avatar argues that Mike Mack ("Mack"), EMI's vice president of urban sales and marketing over the duration of the Distribution Agreement until early 2002, instructed EMI's sales and marketing staff to stop providing support for the Oz Album. Robinson stated in his deposition that:

> [T]here was a general rumor in the industry that [EMI] was not working on [Avatar's] behalf on the Oz record and that ... because Mike Mack was mad at me, he had instructed his staff to not work on the record and then discussed the Oz project with other senior [EMI] executives and the general viewpoint of these executives was not to work on the Oz record. That was a general rumor.

(Deposition of Larry Robinson, September 17, 2003, at 97–98, attached as Exh. E to Calkins Dec.)

Robinson argues that, on behalf of Avatar, he did not object to the monthly account statements when Avatar received them because at that time, he "had no idea that EMI had breached the [Distribution] Agreement by sabotaging the Oz Album. Had I known this, I would have voiced my objection to being charged for services that were not performed." (Robinson Dec. ¶ 31.)

■ Avatar provides no evidence whatsoever to support this allegation against EMI. Absent any other supporting evidence, Robinson's statement about a gen-

---

1. Under New York State law, which applies in this diversity action, choice of law provisions in a contract are generally enforceable absent fraud or overriding public policy concerns, neither of which are at issue here. *See Ter-* *williger v. Terwilliger*, 206 F.3d 240, 245 (2d Cir.2000); *Marine Midland Bank, N.A. v. United Missouri Bank, N.A.*, 223 A.D.2d 119, 643 N.Y.S.2d 528, 530–31 (App. Div. 1st Dep't 1996).

eral rumor cannot suffice to avoid summary judgment on EMI's account stated claim. Throughout the duration of the Distribution Agreement and over the course of negotiations to extend it, Avatar repeatedly indicated both its intent to pay EMI its full balance owed and to continue a working relationship with EMI. At no time over the life of the Distribution Agreement and the negotiations to extend it, which continued until April 2003, just weeks before the initiation of this litigation, did Avatar make any objections to the accuracy or validity of the account statements it received from EMI. Not until the initiation of this litigation did Avatar suddenly argue that it should not have to pay EMI because of EMI's alleged failures to fulfill its contractual obligations. In ordinary business practice, breaches of contract are not discovered for the first time in response to the initiation of litigation. On the record before it, the Court finds no evidence of fraud, mistake, or equitable considerations sufficient to avoid an award of summary judgment to EMI on its claim for account stated in the amount of $1,136,160.71.

## C. ROBINSON'S PERSONAL GUARANTY

▮ EMI argues that pursuant to the Distribution Agreement, Robinson is personally liable for any amounts that Avatar owes EMI. Assuming that the principal debtor is liable, a guaranty is enforceable if it is unconditional and written in clear and unambiguous terms. *See Bank of New York v. Tri Polyta Fin. B.V.*, No. 01 Civ. 9104, 2003 WL 1960587 (S.D.N.Y. Apr. 25, 2003); *Ursa Minor Ltd. v. Aon Fin. Prods., Inc.*, No. 00 Civ. 2474, 2000 WL 1010278 (S.D.N.Y. July 21, 2000). Moreover, the Distribution Agreement was negotiated at arms-length by sophisticated parties represented by counsel, which further supports its enforceability. *See Ursa Minor Ltd.*, 2000 WL 1010278, at *8. New

York State courts consistently enforce unconditional guarantees in these circumstances. *See First New York Bank for Business v. DeMarco*, 130 B.R. 650, 654 (S.D.N.Y.1991) (collecting cases from New York State courts).

Robinson argues that because the guaranty in the Distribution Agreement does not contain language expressly waiving any defenses, setoffs or counterclaims, he is not prevented from raising defenses. Robinson notes that the cases on which EMI relies to buttress the enforceability of the guaranty all contained more elaborate guarantees and waivers of defenses than Robinson's guaranty in the Distribution Agreement. The guaranty at issue in *Crossland Fed. Sav. Bank v. A. Suna & Co. Inc.*, 935 F.Supp. 184, 192–93 (E.D.N.Y.1996), for example, provided that it was enforceable "without regard to the legality, validity, regularity, or enforceability [of the underlying agreement] and without regard to any other circumstances whatsoever which might otherwise constitute a legal or equitable discharge of a surety or guarantor, including, without limitation, any right of setoff or counterclaim." By contrast, the guaranty in the Distribution Agreement merely provides that Robinson "irrevocably and unconditionally guarantees the full payment and performance of all obligations of Avatar Records under this Agreement." (Distribution Agreement at § 22(i).)

But Robinson cites no authority, nor has the Court discovered any, for his assertion that the language in his guaranty is insufficient to be enforceable, or that any particular magic words must appear. The guaranty is plain and easy to understand. Robinson is bound to cover any obligation of Avatar.

## D. BREACH OF CONTRACT CLAIMS

EMI and Avatar both bring breach of contract claims. Because the claims and

defenses overlap to some extent, the Court addresses the contract claims together.

EMI argues that Avatar breached the Distribution Agreement and the Amendment by failing to pay EMI after EMI performed its obligations under those agreements. As defenses and counterclaims, Avatar argues that EMI failed to perform its duties under the Distribution Agreement by undermining sales of the Oz Album and not releasing the NVA Album, and that EMI breached the oral contract extending the Distribution Agreement to December 31, 2003 by not releasing the NVA Album and by terminating the Distribution Agreement on April 9, 2003. EMI replies that it performed all of its obligations and that it never extended the Distribution Agreement beyond December 31, 2002.

The Court has already addressed Avatar's allegations regarding EMI's sabotage of the Oz Album in 2001 and concluded that Avatar has produced no evidence sufficient to create a genuine dispute of material fact about that issue.

The principal dispute in the contract claims is whether the Distribution Agreement was orally extended for one year, or whether it expired on December 31, 2002. Avatar argues that Proietto informed Robinson that EMI's president had approved a one-year extension of the Distribution Agreement, and therefore not only is Avatar not liable to EMI for breach of contract, but EMI is liable to Avatar for ceasing distribution of all Avatar Records in April 2003. EMI argues that the Distribution Agreement expressly prohibits oral modifications and requires that all alterations to the contract be made in writing.

■ A plaintiff seeking to recover for breach of contract under New York State law must prove " '(1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages.' " *Terwilliger*, 206 F.3d at 246

(quoting *First Investors Corp. v. Liberty Mut. Ins. Co.*, 152 F.3d 162, 168 (2d Cir. 1998)). Although the parties characterize the dispute as one over performance and breach, the principal area of disagreement is more properly framed as one over the existence of a contract, or more accurately whether the contract was renewed for an additional year beyond December 31, 2002. If the Distribution Agreement was not extended, then EMI was not obligated to distribute any Avatar Records in 2003 and Avatar's defenses and counterclaims are meritless. By contrast, if the Distribution Agreement was extended, then EMI would have been required to continue to distribute Avatar's Records in 2003.

It is undisputed that there is no written agreement extending the Distribution Agreement beyond its natural expiration date of December 31, 2002. Avatar claims that in July 2002, Robinson proposed restructuring and extending the Distribution Agreement to enable Avatar to pay off its balance to EMI. Avatar asserts that in September 2002, Proietto notified Robinson via telephone that EMI's president had approved the deal.

Significantly, EMI does not deny that this conversation occurred. Instead, it states that Proietto was merely a financial officer who "did not possess the position or authority to make deals on EMI's behalf." (Plaintiff's Counterstatement to Defendants' Local Rule 56.1 Separate Statement, dated April 16, 2004 ("EMI Counter."), at ¶ 5.) But Avatar does not claim that Proietto acted on his own when he informed Robinson that the Distribution Agreement was extended. Instead, Avatar asserts that Proietto told Robinson that EMI's president had approved the new deal.

EMI's primary argument is that anything Proietto may have told Robinson is irrelevant because the parties never reduced any terms to writing, as the Distri-

bution Agreement required. As a general rule, under New York law "[a] written agreement or other written instrument which contains a provision to the effect that it cannot be changed orally, cannot be changed by an executory agreement unless such executory agreement is in writing and signed by the party against whom enforcement of the change is sought or by his agent." N.Y. Gen. Oblig. Law § 15–301; *see also, National Westminster Bank, U.S.A. v. Ross,* 130 B.R. 656, 676 (S.D.N.Y. 1991) ("An alleged oral agreement subsequent to, and in derogation of, an agreement containing such a 'no oral modification' clause can neither modify, nor create a triable issue of fact with respect to, the written agreement.").

▮ A party may be permitted to establish proof of and enforce an oral agreement modifying a preexisting written contract despite a "no written modifications" clause, however, if there has been partial performance of the oral agreement and if that performance is "unequivocally referable to the oral modification." *Rose v. Spa Realty Assocs.,* 42 N.Y.2d 338, 397 N.Y.S.2d 922, 366 N.E.2d 1279, 1283 (1977). Additionally, New York law provides for an equitable estoppel exception to § 15–301 if one party to the written contract "has induced another's significant and substantial reliance upon an oral modification," and if the conduct relied upon is "not otherwise … compatible with the agreement as written." *Rose,* 397 N.Y.S.2d 922, 366 N.E.2d at 1283; *see also, L & B 57th St., Inc. v. E.M. Blanchard, Inc.,* 143 F.3d 88, 93 (2d Cir.1998); *Club Haven Inv. Co., LLC v. Capital Co. of Am., LLC,* 160 F.Supp.2d 590, 592 (S.D.N.Y.2001); *Joseph P. Day Realty Corp. v. Jeffrey Lawrence Assocs., Inc.,* 270 A.D.2d 140, 704 N.Y.S.2d 587 (App. Div. 1st Dep't 2000).

▮ Avatar argues that under these principles of equitable estoppel, EMI's conduct in the fall of 2002 creates at least a genuine issue of fact as to whether the Distribution Agreement was extended orally. In September 2002, Proietto notified Robinson that EMI's president had approved an extension of the Distribution Agreement. EMI initiated postponing the release date of the NVA Album from October 2002 to January 2003. EMI marketing executives and staff worked with Avatar throughout the fall of 2002 to plan early 2003 marketing campaigns for the NVA and Oz Albums. Moreover, although EMI did not release the NVA Album in January 2003, it apparently continued to distribute other Avatar records and perform its duties under the Distribution Agreement through early April 2003. These actions are inconsistent with the text of the Distribution Agreement, which as written was set to expire on December 31, 2002.

It is true that the parties exchanged a series of correspondence in late 2002 discussing terms for Avatar to pay off its debt to EMI and for an extension of the Distribution Agreement, and that EMI's legal counsel notified Avatar on November 26, 2002 that the Distribution Agreement had not yet been extended beyond December 31, 2002. But in light of the mixed signals that EMI was sending Avatar, a reasonable jury could conclude that the Distribution Agreement was extended. The Court therefore finds that a genuine issue of material fact exists as to whether there was an oral agreement to extend the Distribution Agreement, and accordingly denies EMI's motion seeking summary judgment on its breach of contract claim and dismissal of Avatar's breach of contract counterclaims.

E. *FORECLOSURE OF SECURITY INTEREST*

EMI argues that because Avatar has defaulted on its obligations to pay amounts

due to EMI, EMI is entitled to foreclose on the security interest as set forth in the Distribution Agreement. Under the Uniform Commercial Code, a security interest exists and becomes enforceable in the presence of "value ..., rights or power to transfer rights in collateral ..., and agreement plus satisfaction of an evidentiary requirement." U.C.C. § 9–203 (cmt.2) (2002).

■■■ It is undisputed that Avatar granted EMI a security interest in certain Avatar property and that Avatar had the rights to that property. The Distribution Agreement authorizes EMI to foreclose on the security interest upon Avatar's "failure to pay when due any obligations" of Avatar to EMI. (Distribution Agreement at § 21(c).) EMI perfected its security interest in the collateral by filing a UCC Financing Statement dated January 16, 2001. Avatar disputes EMI's claim that it is in first position as to the collateral and thus senior to any of Avatar's other creditors, but provides ·no evidence to support this assertion. The Court has already determined above that Avatar failed to pay EMI for EMI's performance under the Distribution Agreement.

Accordingly, the Court grants EMI's motion for summary judgment on its claim for foreclosure of security interest. In light of the Court's resolution of the other claims in this litigation, however, EMI may not yet pursue the collateral. Instead, EMI's actual foreclosure on the collateral must await the resolution of liability and damages on the breach of contract claims and counterclaims, because the outcome of those claims may affect the amount of Avatar's liability to EMI.

## F. *IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING*

Avatar brings a counterclaim against EMI for breach of the implied covenant of good faith and fair dealing. Avatar alleges that EMI breached this covenant through Mack's actions involving threats of violence against Robinson; Mack's instructions to the EMI sales staff to stop marketing the Oz Album; EMI's demand that Avatar pay consultants to create fraudulent marketing reports; and EMI's refusal to release the NVA Album.

■■■ New York State law ¨"does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 81 (2d Cir.2002); *see also, Bates Adver. USA, Inc. v. McGregor*, 282 F.Supp.2d 209, 219 (S.D.N.Y.2003).

■■■ Avatar's good faith and fair dealing claim is based on essentially the same facts as the breach of contract claims. Mack's behavior as to the Oz Album and EMI's actions as to the NVA Album have already been addressed in the breach of contract claims and therefore cannot support an independent claim for breach of the implied covenant of good faith and fair dealing.

Avatar also claims that EMI forced it to pay $10,000 for a marketing consultant who bribed retail music stores to report inflated record sales and thereby present an appearance that the store sold more copies of that record than it actually did. Although the allegations of fraudulent marketing practices were not raised in the breach of contract claims, Avatar fails to put forward sufficient evidence to support that charge. Avatar has not introduced any evidence whatsoever to indicate that the marketing consultant engaged in this fraudulent practice in connection with any Avatar Record. Instead, Avatar relies on deposition testimony by EMI executives who indicated a general awareness that the type of fraudulent practice at issue is

carried out by some companies in the music industry and that the marketing consultant in question is the subject of rumors regarding engaging in that fraudulent business practice. Avatar presents no documentation of actual sales of Avatar Records or the allegedly inflated sales, nor does Avatar present evidence from any individual who was asked by the particular marketing consultant to produce an inflated sales report. Accordingly, the Court grants EMI's motion for summary judgment dismissing Avatar's claim of breach of the implied covenant of good faith and fair dealing.

### G. *UNFAIR COMPETITION*

■ Avatar's fourth counterclaim against EMI is for unfair competition. New York State unfair competition law "has been broadly described as encompassing any form of commercial immorality, or simply as endeavoring to reap where one has not sown; it is taking the skill, expenditures and labors of a *competitor*, and misappropriati(ng) for the commercial advantage of one person ... a benefit or property right belonging to another." *Telecom Int'l Am., Ltd. v. AT & T Corp.*, 280 F.3d 175, 197–98 (2d Cir.2001) (quoting *Roy Export Co. Establishment of Vaduz, Liechtenstein v. Columbia Broad. Sys., Inc.*, 672 F.2d 1095, 1105 (2d Cir.1982)) (emphasis added). By definition, competition is fundamental to any unfair competition claim. Where there is no competition, there can be no unfair competition. Avatar and EMI are not competitors in any sense of that word. EMI and Avatar engage in different businesses. Avatar produces records and EMI distributes them. Indeed, their relationship was symbiotic as regards the products and services covered by the Distribution Agreement. Avatar's financial success hinged at least in part on EMI's success in soliciting sales of the Records; and EMI's financial success turned at least in part on Avatar producing marketable Records. EMI could achieve no commercial advantage under the Distribution Agreement by undermining sales of Avatar's Records. Moreover, if EMI did undermine sales of Avatar's Records, such action would be a breach of its obligations under the Distribution Agreement, not unfair competition. Avatar simply has no basis on which to maintain an unfair competition claim against EMI. Accordingly, EMI's motion for summary judgment dismissing Avatar's counterclaim for unfair competition is granted.

### H. *RESCISSION*

■ Avatar's final counterclaim is for rescission of the Distribution Agreement. Rescission of a contract by a court is an extraordinary equitable remedy under New York State law, and is appropriate only when the breach is " 'material and willful, or, if not willful, so substantial and fundamental as to strongly tend to defeat the object of the parties in making the contract.' " *Septembertide Publ'g B.V. v. Stein & Day, Inc.*, 884 F.2d 675, 678 (2d Cir.1989) (quoting *Callanan v. Powers*, 199 N.Y. 268, 92 N.E. 747 (1910)); *see also Krumme v. WestPoint Stevens, Inc.*, 238 F.3d 133 (2000). Because rescission is a remedy for breach of contract and the breach of contract claims and counterclaims remain pending, it is premature to resolve Avatar's rescission counterclaim through these motions. Accordingly, EMI's motion for summary judgment on Avatar's rescission counterclaim is denied.

### III. *REMAINING PROCEEDINGS*

A question remains as to how to proceed with the remaining claims and counterclaims in this litigation. Even if an oral contract to extend the Distribution Agreement existed, and even if EMI breached that oral contract, Avatar and by extension Robinson are still liable on EMI's account

stated claim for $1,136,160.71, plus interest and attorneys' fees. Should Avatar prevail at trial on its breach of oral contract claim, it would be entitled to an offset from that judgment in the amount of any damages it receives for EMI's breach. That there is a genuine dispute on one of Avatar's counterclaims does not negate the absence of any dispute on EMI's account stated claim. EMI's account stated claim is analytically distinct from Avatar's breach of contract counterclaim.

Federal Rule of Civil Procedure 54(b) provides that whenever multiple claims or counterclaims are involved in an action and a court has finally resolved some but not all of the claims, "the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment." Fed.R.Civ.P. 54(b); *Ginett v. Computer Task Group, Inc.*, 962 F.2d 1085, 1091 (2d Cir.1992). A meritorious counterclaim in any litigation will nearly always offset a defendant's liability on a plaintiff's claim. With this in mind, the Supreme Court has held that the "mere presence" of "nonfrivolous counterclaims" does not prevent an entry of final judgment pursuant to Rule 54(b) on any claims that a court has finally resolved. *Curtiss–Wright Corp. v. General Elec. Co.*, 446 U.S. 1, 9, 100 S.Ct. 1460, 64 L.Ed.2d 1 (1980); *see also, Siemens Westinghouse Power Corp. v. Dick Corp.*, 220 F.R.D. 232, 234 (S.D.N.Y.2004). A Rule 54(b) certification of final judgment on any claim would be inappropriate only if such claim is "inherently inseparable" or "inextricably interrelated" to remaining claims. *Ginett*, 962 F.2d at 1096; *Siemens Westinghouse*, 220 F.R.D. at 234.

As noted above, the Court finds that EMI's account stated claim is analytically distinct from the breach of contract claims. EMI has already waited several years to recover most of the amount that Avatar owes it, and EMI should not have to experience what may be substantial further delay until Avatar's counterclaims are finally resolved for it to have legal assurance that it can collect from Defendants the amount to which it is entitled.

Nevertheless, all the claims and counterclaims in this litigation arise from essentially the same set of underlying facts, and in particular from interpretation and application of the Distribution Agreement and the behavior of the parties in performing their duties under that contract. Principles of judicial economy strongly discourage piecemeal appeals of litigation, especially when multiple appeals in the same case may involve the same set of facts. *See O'Bert ex rel. Estate of O'Bert v. Vargo*, 331 F.3d 29, 40 (2d Cir.2003); *UniCredito Italiano SPA v. J.P. Morgan Chase Bank*, 288 F.Supp.2d 485, 506 (S.D.N.Y. 2003); *Burrell v. State Farm & Cas. Co.*, 226 F.Supp.2d 427, 432–33 (S.D.N.Y.2002). Although there is no particular reason to delay final judgment on EMI's account stated claim, there is also no indication that undue hardship or injustice to EMI will result from a delay in the entry of final judgment on its account stated claim, or that Defendants would face such hardships if they are denied the chance to appeal immediately the Court's decision on EMI's account stated claim. *See L.B. Foster Co. v. America Piles, Inc.*, 138 F.3d 81, 86 (2d Cir.1998); *Cullen v. Margiotta*, 618 F.2d 226, 228 (2d Cir.1980).

Given these policy considerations, and in view of the remaining disputes still to be resolved and the prospects that EMI's judgment may be reduced by offsets should Avatar prevail on its surviving counterclaims, the Court is persuaded that the most prudent course is to direct the entry of a final judgment on EMI's ac-

count stated claim in the amount of $1,136,160.71, plus appropriate interest and attorney's fees pursuant to Rule 54(b), but to stay enforcement of that judgment pursuant to Fed.R.Civ.P. 62(h)[2] until the resolution of the remaining breach of contract claims. *See Curtis Publ'g Co. v. Church, Rickards & Co.,* 58 F.R.D. 594 (E.D.Pa.1973) (entering final summary judgment pursuant to Fed.R.Civ.P. 54(b) on plaintiff's claims for amount owed under contract but staying enforcement of judgment pursuant to Fed.R.Civ.P. 62(h) pending resolution of counterclaims for breach of contract, which would be resolved at trial); *Estate of John Lennon, by Lennon, v. Leggoons, Inc.,* No. 95 Civ. 8872, 1997 WL 346733 (S.D.N.Y. June 23, 1997); *Orient Atlantic Parco, Inc. v. Maersk Lines,* 740 F.Supp. 1002 (S.D.N.Y. 1990).

## IV. *ORDER*

For the reasons discussed above, it is hereby

**ORDERED** that the motion of plaintiff EMI Music Marketing ("EMI") for summary judgment is denied as to EMI's first claim for relief for breach of contract against defendant Avatar Records, Inc. ("Avatar"); and it is further

**ORDERED** that the motion of EMI for summary judgment is granted as to EMI's second claim for relief for breach of contract and guaranty against defendant Larry Robinson ("Robinson"), and EMI's third claim for relief for account stated against Avatar, and that pursuant to these claims Avatar and Robinson shall be liable to EMI, jointly and severally, and EMI shall be entitled to collect from Avatar and Robinson damages in an amount of $1,136,160.71 plus appropriate interest and attorney's fees; and it is further

**ORDERED** that the motion for summary judgment on EMI's fourth claim for relief for foreclosure of security interest against Avatar is granted; and it is further

**ORDERED** that the motion of EMI for summary judgment is denied as to Avatar's first counterclaim for breach of written contract, second counterclaim for breach of oral contract, and fifth counterclaim for rescission; and it is further

**ORDERED** that the motion of EMI for summary judgment is granted as to Avatar's third counterclaim for breach of the implied covenant of good faith and fair dealing and Avatar's fourth counterclaim for unfair competition; and it is further

**ORDERED** that execution is stayed on EMI's judgment authorized herein and that EMI may not pursue foreclosure against Avatar pending resolution of open claims remaining in this action; and it is further

**ORDERED** that the parties are directed to appear for a conference before the Court on Friday, 14 May 2004 at 11:15 a.m. in Courtroom 905 at 40 Centre Street, New York, N.Y. to discuss future proceedings in this case.

**SO ORDERED.**

---

**2.** Fed.R.Civ.P. 62(h) provides that "[w]hen a court has ordered a final judgment under the conditions stated in Rule 54(b), the court may stay enforcement of that judgment until the entering of a subsequent judgment or judgments and may prescribe such conditions as are necessary to secure the benefit thereof to the party in whose favor the judgment is entered."