EMI MUSIC MARKETING (f/k/a EMI Music Distribution), a division of Capitol Records, Inc., Plaintiff,

v.

AVATAR RECORDS, INC. and Larry Robinson, Defendants.

No. 03 Civ. 2783VM.

United States District Court, S.D. New York.

March 31, 2005.

---

**46.** *See* Pl. Mem. at 5.

338

Rebecca Calkins, Michael S. Elkin, Shari H. Markowitz, Shari Markowitz Savitt, Thelen, Reid & Priest, L.L.P., Los Angeles, CA, for Emi Music Marketing.

Paul A. Chin, Law Office of Paul A. Chin, New York, NY, for Avatar Records, Inc.

## DECISION AND ORDER

MARRERO, District Judge.

The Court presided over a jury trial in this case from September 27, 2004 through October 7, 2004. At the close of arguments and before the case was submitted to the jury, Plaintiff EMI Music Marketing ("EMI") moved, pursuant to Federal Rule of Civil Procedure 50(a) ("Rule 50(a)"), for judgment as a matter of law. The Court reserved judgment on that motion pending the jury's verdict. The jury returned two unanimous special verdicts: one in favor of EMI and one in favor of Defendant Avatar Records, Inc. ("Avatar"). After the verdict was returned, EMI timely[1] moved, pursuant to Federal Rule of Civil Procedure 50(b) ("Rule

---

**1.** Federal Rule of Civil Procedure 50(b) ("Rule 50(b)") provides that a party may renew a request for judgment as a matter of law that was filed pursuant to Rule 50(a) by "filing a motion no later than 10 days after entry of judgment." The verdict in this case was entered on October 20, 2004. EMI filed its Rule 50(b) motion, in the form of a letter to the Court, on October 21, 2004.

50(b)"), to renew its Rule 50(a) motion. For the reasons stated below, the Court grants EMI's motion.

In addition, EMI has moved for pre-judgment interest on the monetary amount that the Court awarded to EMI in its Decision and Order on the parties' motions for summary judgment ("*EMI I*"),[2] and for attorneys' fees and costs. The Court also grants these motions.

## I. *FACTS AND PROCEEDINGS*

The Court addressed many of the facts and issues involved in this case in *EMI I*. Thus, the facts are reiterated here only to the extent necessary to explain the basis for the Court's ruling on the motions presently before it.

EMI, a music production company, brought this action for breach of contract and account stated against Avatar and Avatar's president, Larry Robinson ("Robinson" and together with Avatar, "Defendants"). Avatar brought counterclaims for breach of contract, breach of implied covenant of good faith and fair dealing, unfair competition, and rescission. The Court disposed of all of EMI's claims and some of Avatar's counterclaims at the summary judgment phase.[3] The case proceeded to trial on Avatar's counterclaims for breach of contract and rescission.

These counterclaims arose from an alleged oral extension and modification of a three-year distribution agreement that EMI and Avatar had entered into on January 1, 2000 (the "Distribution Agreement" or the "Agreement"). Under the terms of the Agreement, EMI became the exclusive distributor in the United States of Avatar's recorded audio and audiovideo materials ("Records"). As payment for its services, EMI was to receive a distribution fee in the form of a percentage of net sales of Avatar's Records during each year of the Distribution Agreement. EMI also was entitled to charge Avatar for each unit that retailers returned to EMI and for each slow-moving unit of inventory. The Distribution Agreement allowed EMI to deduct from sales a reserve which it could apply towards any amount due from Avatar.

During the time that the Distribution Agreement was in effect, Avatar accumulated a debt of over one million dollars to EMI. In June of 2002, Robinson proposed a restructuring and extension of the Distribution Agreement to enable Avatar to pay off its debt to EMI while remaining in business. Robinson's proposal contained three elements: (1) that the Distribution Agreement would remain in effect for another year; (2) that, after taking the distribution fee, EMI would retain fifty percent of the money that would be due to Avatar in order to pay down Avatar's outstanding debt; and (3) that part of the balance on a loan that EMI had extended to Avatar would be converted into an advance. Defendants argued at trial that EMI, through its then vice president of finance, Giulio Proietto ("Proietto"), indicated to Robinson in a series of telephone calls in September of 2002 that EMI had approved Robinson's proposal.

After the alleged approval of Robinson's restructuring proposal, but prior to the expiration date of the original Distribution

---

**2.** *EMI Music Marketing v. Avatar Records, Inc.*, 317 F.Supp.2d 412 (S.D.N.Y.2004).

**3.** The Court granted EMI summary judgment on its breach of contract and guaranty claim against Robinson, its claim for account stated against Avatar, and its claim for foreclosure of security interest against Avatar. The Court awarded EMI $1,136,160.71 in damages. Because EMI's only claim surviving summary judgment sought the same relief the Court had already granted, EMI withdrew that claim. The Court also granted EMI summary judgment as to Avatar's counterclaims for breach of implied covenant of good faith and fair dealing and for unfair competition.

Agreement, Robinson and EMI continued to prepare to release an Avatar Record entitled "National Vinyl Association—Straight from the Crates Vol. 1" (the "NVA Album"). The parties also worked on the marketing of an Avatar album entitled "Oz" (the "Oz Album"), which EMI had previously released and distributed for Avatar, after the restructuring proposal had allegedly been approved.

Correspondence between representatives of the two parties during the months after the alleged approval of Robinson's proposal documents the deterioration of their relationship, which culminated in the filing of the instant law suit. In a letter to Robinson dated November 13, 2002, Dina Hellerstein ("Hellerstein"), EMI's vice president for legal and business affairs, indicated that EMI was prepared to exercise its right to terminate the Distribution Agreement or let it expire naturally on December 31, 2002, and pursue legal options for the balance Avatar owed to EMI. On November 26, 2002, Hellerstein sent an email to Robinson stating: "We received from Avatar the new release sheet on NVA for the January 28, 2003 New Release Book. As you know, our deal ends on December 31, 2002 and we have not yet agreed to extend it. We therefore cannot include NVA in the book." (Email dated Nov. 26, 2002 from Hellerstein to Robinson, attached as Ex. 10 to Declaration of Larry Robinson dated April 6, 2004.)

Avatar's then counsel Denis Kellman ("Kellman") responded to Hellerstein on December 4, 2002, stating that Proietto had informed Robinson during the Summer of 2002 that EMI's president had approved a one-year extension of the Distribution Agreement as part of Avatar's plan to repay its debt to EMI. (Letter from Kellman to Hellerstein dated Dec. 4, 2002, attached as Ex. N to Declaration of Rebecca Lawlor Calkins dated March 22, 2004.) Kellman's letter also stated that,

"[r]elying upon the fact that an agreement had been reached between EMI and Avatar with respect to the modified Avatar [repayment] Plan, Mr. Robinson continued to expend considerable time, money and effort readying Avatar's new releases." (Id.)

Between December of 2002 and February of 2003, Avatar and EMI exchanged a series of proposals and counter-proposals aimed at reaching an agreement for Avatar to pay off its balance to EMI and continuing the business relationship between the parties. On April 9, 2003, EMI terminated these discussions. This litigation followed.

At trial, Defendants argued that EMI had approved Robinson's restructuring proposal and that EMI had breached the alleged restructured agreement by: (a) refusing to release the NVA album in January 2003; (b) refusing to re-release the Oz album; and (c) ceasing to distribute Avatar Records in April 2003. At the close of arguments, the Court instructed the jury that it could find EMI liable on a breach of contract theory or on a promissory estoppel theory. The jury found EMI liable only on promissory estoppel grounds and awarded Avatar $25,000 in compensatory damages.

## II. DISCUSSION

### A. MOTION FOR JUDGMENT AS A MATTER OF LAW

In order to prevail on a motion for judgment as a matter of law pursuant to Rule 50(b), the moving party must demonstrate that "there is no legally sufficient evidentiary basis for a reasonable jury to find for ... [the non-moving] party." *Merrill Lynch Interfunding, Inc. v. Argenti*, 155 F.3d 113, 120 (2d Cir.1998); *see also United States v. Landau*, 155 F.3d 93, 100 (2d Cir.1998) (stating that a district court may grant a motion for judgment as a matter of law "[o]nly if there is such a complete

absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against [the moving party]." (quoting *LeBlanc–Sternberg v. Fletcher,* 67 F.3d 412, 429 (2d Cir.1995)) (quotation marks omitted). In determining whether or not to grant a Rule 50(b) motion, the Court must view the evidence in the light most favorable to the non-moving party and "must give deference to all credibility determinations and reasonable inferences of the jury." *Caruolo v. John Crane, Inc.,* 226 F.3d 46, 51 (2d Cir.2000) (quoting *Galdieri–Ambrosini v. National Realty & Dev. Corp.,* 136 F.3d 276, 289 (2d Cir.1998)) (quotation marks omitted).

■ As a preliminary matter, the Court must determine whether or not EMI's Rule 50(b) motion is properly before it. "A Rule 50(b) motion is limited to those grounds that were specifically raised in the prior [Rule 50(a)] motion..... While [this] specificity requirement is obligatory, the burden is upon the non-moving party to raise the issue; otherwise it is waived."[4] *United States ex rel. Maris Equipment*

*Co., Inc. v. Morganti, Inc.,* 163 F.Supp.2d 174, 181 (E.D.N.Y.2001) (quoting *Galdieri–Ambrosini,* 136 F.3d at 286; citing *Marfia v. T.C. Ziraat Bankasi,* 147 F.3d 83, 87 (2d Cir.1998)) (quotation marks omitted). *See also* 9 James Wm. Moore et al., *Moore's Federal Practice* ¶ 50.43[3][a] (3d ed. 2005) ("In making a renewed motion for judgment, a movant generally may assert only those grounds previously raised in the pre-verdict motion for judgment."). EMI's letter to the Court requesting, pursuant to Rule 50(b), that its Rule 50(a) motion be renewed states: "EMI hereby requests that the [Rule 50(a)] motion be renewed pursuant to FRCP 50(b) and that the Court direct entry of judgment as a matter of law in favor of EMI on Avatar's breach of contract and promissory estoppel claims, and all damages sought in connection therewith." (Letter to Judge Marrero from Shari M. Savitt dated Oct. 21, 2004.)

EMI's Rule 50(a) motion, however, sought a judgment as a matter of law only with respect to Avatar's breach of contract claim and all damages sought in connection therewith. EMI did not address Avatar's claim based on the theory of promissory estoppel in its Rule 50(a) motion papers, nor in oral argument on the motion.[5] De-

4. The specificity requirement also may be set aside in order to "prevent a manifest injustice in cases [w]here a jury's verdict is wholly without legal support." *Scott v. Rosenthal,* No. 97 Civ. 2143, 2001 WL 968992, at *1 (S.D.N.Y. Aug. 24, 2001) (quoting *Pahuta v. Massey–Ferguson, Inc.,* 170 F.3d 125, 129 (2d Cir.1999)) (quotation marks omitted).

5. EMI's argument in its Rule 50(a) motion papers regarding liability is limited to the contentions that there was no enforceable oral contract extending the Distribution Agreement and that, even if there was such a contract, EMI did not breach it. Similarly, EMI's oral argument in support of the Rule 50(a) motion did not address the issue of promissory estoppel, instead focusing on the

breach of contract theory of liability. (*See* Tr. at 788–790.)

Although counsel for EMI referred at one point to "equitable estoppel" in the oral argument in support of the Rule 50(a) motion, the context demonstrates that counsel did not thereby refer to the promissory estoppel theory of liability, but instead to an exception to the rule that a written contract may not be orally modified in the absence of a writing. Counsel stated that "there's two exceptions [to the no oral modification rule]" and characterized these as "part performance" and "equitable estoppel." (Tr. at 791.) The two exceptions to the no oral modification rule that the Court and the parties had discussed prior to oral argument on the Rule 50(a) motion, and that were included in the jury

fendants, however, did not object to the Rule 50(b) motion on the grounds that it did not meet the specificity requirement.[6] As a result, the specificity requirement is waived in this case and EMI's motion for a judgment as a matter of law with respect to Defendants' promissory estoppel claim is properly before the Court.[7]

■ Because the jury found in favor of EMI with respect to Avatar's breach of contract theory of liability, EMI's Rule 50(a) motion with respect to that basis of liability is moot. *See* Fed.R.Civ.P. 50 advisory committee's note (1991) ("a jury verdict for the moving party moots the issue [raised in a motion for judgment as a matter of law] ...."). Accordingly, the Court will consider the instant motion only as it relates to the jury's verdict in favor of Avatar based on the theory of promissory estoppel and the jury's award of damages.

■ The Court finds that the evidence at trial is not sufficient to support the jury's finding that EMI is liable to Avatar under the doctrine of promissory estoppel. Because there is no legally sufficient evidentiary basis for a reasonable finding of liability on this theory, the Court further concludes that the jury's award of damages to Avatar must be set aside.

In order to hold EMI liable under the doctrine of promissory estoppel, Avatar would have had to prove by a preponderance of the evidence that EMI made an explicit promise that was clear and unambiguous; that Avatar reasonably relied on that promise; that such reliance was foreseeable; and that Avatar sustained injury by reason of its reliance. *See In re Ionosphere Clubs, Inc.*, 85 F.3d 992, 999–1000 (2d Cir.1996). As noted above, Avatar argued at trial that EMI, through Proietto, represented to Robinson that two EMI executives, Richard Cottrell ("Cottrell"), then EMI's President, and Mike Mooney ("Mooney"), then EMI's chief financial officer, had approved Robinson's June 2002 proposal to extend and restructure the Distribution Agreement. This alleged representation by Proietto is the "promise" in question here.

As indicated above, Robinson testified at trial that his proposal to EMI in June 2002 consisted of three elements: (1) that the Agreement be extended for one year after the December 31, 2002 expiration date; (2) that EMI keep fifty percent of the money that would be due to Avatar after EMI took its distribution fee so as to pay down Avatar's outstanding debt to EMI; and (3) that Avatar's debt on its loan from EMI be converted into "an advance paid back by generating sales out of records." (Tr. at 68–69.) Robinson further testified that he

---

instructions, were part performance and reasonable reliance. EMI's counsel's reference to "equitable estoppel" as an exception to the no oral modification rule thus appears to have been intended to refer to the reasonable reliance exception. (*See* Tr. at 793 ("Estoppel requires a reasonable reliance.").) While reasonable reliance is an element of promissory estoppel, the absence of any mention of its other key elements in EMI's oral argument indicates that EMI's discussion of reasonable reliance was aimed exclusively at demonstrating that the facts of the case did not fall under an exception to the no oral modification rule, rather than that EMI could not be held liable on the theory of promissory estoppel.

6. Defendants orally opposed EMI's Rule 50(a) motion, but did not file a written opposition to that motion or to EMI's Rule 50(b) motion.

7. Another requirement regarding the contents of a renewed motion for judgment as a matter of law is that it "generally must state the grounds on which it is based." 9 *Moore's Federal Practice* § 50.43[2]. Although EMI's letter moving to renew its Rule 50(a) motion did not state the grounds on which the renewal motion was based, the Court finds that it is sufficiently aware of EMI's general position to adjudicate that motion. *See id.* ("[t]echnical precision is unnecessary in stating grounds for a renewed motion ... providing the trial court is aware of the movant's position.").

proposed these three modifications to the Agreement to Cottrell at a meeting in June 2002 and that, immediately after that meeting, at Cottrell's suggestion, he met with other EMI executives, including Hellerstein and Mooney. (*See* Tr. at 73.) Robinson explained that Cottrell wanted him to meet with these other EMI executives in order "to run the numbers" and "talk about [Robinson's] projections and the financial assumptions that are part and parcel of this proposal." (*Id.*) According to Robinson, Proietto was called into this meeting and Hellerstein and Mooney told Robinson that Proietto would be working with him on the proposal and that he would contact Robinson "to start going over the numbers and [Avatar's] budgets involving [its] future productions, [its] overhead, things like that...." (Tr. at 79.)

The discussions that ensued between Robinson and Proietto focused on Avatar's projected operating budget and costs related to the release of any Records. (*See* Tr. at 81–82.) According to Robinson, once Proietto had completed his due diligence and determined that "the money that [they] had allocated in [Proietto's] spreadsheet was going to be enough to run Avatar until [Avatar and EMI] could start generating money from record sales," (Tr. at 82–83), Proietto told Robinson that "the deal ha[d][his] approval," (Tr. at 83), and that the next steps were for Mooney and Cottrell to approve it. Robinson testified that Proietto represented to him in two telephone conversations in early September 2002 that Mooney and, subsequently, Cottrell had "approved the deal." (Tr. at 88.)

Assuming that Proietto did in fact make these representations to Robinson, the Court must determine whether or not these statements constitute a clear and unambiguous promise to proceed in accordance with Robinson's proposed terms, and, if so, whether or not Avatar reasonably and foreseeably relied on that promise and sustained injury as a result of so doing.

It is conceivable that Proietto's statements constituted a clear and unambiguous promise with respect to the first and second of the three elements of Robinson's proposed agreement. It would be unreasonable, however, to find based on the record before the Court that those communications conveyed a promise concerning, or even addressed, the third of Robinson's proposed terms. Proietto's research and discussions with Robinson culminated in three proposals "regarding the distribution of Avatar product and the retaining of cash to be applied to the outstanding balance." (Memo from Giulio Proietto to Richard Cottrell dated September 3, 2002 (the "Proietto Memo" or the "Memo") at 1652,[8] Trial Ex. A.) These proposals considered only the percentage of funds generated by sales of Avatar Records to be retained by EMI as a reserve and the percentage of funds beyond the reserve to be applied to Avatar's outstanding balance with EMI. Thus, Proietto's calculations explicitly concerned solely the second element of Robinson's proposal: "changing the amount of money EMI could keep to ... pay down [the] outstanding balance." (Tr. at 68.) In addition, Robinson's own testimony regarding the scope of his discussions with Proietto makes clear that they did not concern the issue of repaying the balance on EMI's loan. (*See* Tr. at 81–83.)

Viewing the evidence in the light most favorable to Defendants, it is arguable that Proietto's proposals assumed an extension of the Distribution Agreement for one year, such that approval of one of the prospects implied approval of a one-year

8. This document bears Bates stamp numbers 1652 through 1658.

extension as well. Although the Proietto Memo summarizes "Avatar's work in process and cash requirements [only] through December 31, 2002," (Proietto Memo at 1652), the Memo also includes, in a list of projected Avatar releases, a Record projected to be released in January of 2003, after the expiration of the original Distribution Agreement. (*See* Proietto Memo at 1657.)

Neither the Proietto Memo nor Robinson's testimony concerning Proietto's representations to him, though, contain any indication that Proietto and Robinson ever discussed or resolved the issue of the loan repayment. Because Robinson's proposal consisted of three components, a promise regarding two of those components—even if it was clear and unambiguous—would still be contingent on approval of the third component. There is no evidence on the record to suggest that either of the parties at any time contemplated an extension of the Distribution Agreement in the absence of a resolution of the question of how EMI's loan would be repaid. Rather, the record, including Robinson's own testimony, demonstrates that the conversion of the loan into an advance was an integral component of any extension of the Distribution Agreement.

In the absence of any evidence suggesting that Robinson and Proietto resolved or even discussed the third prong of Robinson's proposal, the Court finds that a jury

determination that EMI made a clear and unambiguous promise to extend the Distribution Agreement based on Robinson's entire proposal could only be "the result of sheer surmise and conjecture," or a verdict that, on the record before it, no reasonable and fair minded jury could render against EMI. *Landau*, 155 F.3d at 100 (quotation marks and citation omitted). Therefore, the Court finds that the evidence on the record before it is insufficient, as a matter of law, to support a verdict in favor of Avatar based on the theory of promissory estoppel.[9]

Given that the jury rejected the only other available theory of liability in this case, the Court's finding that the evidence is legally insufficient to support a finding of liability based on promissory estoppel eliminates any basis for an award of damages. Accordingly, the Court concludes that the jury's verdict in favor of Avatar based on the theory of promissory estoppel and its award of damages based on that theory must be vacated.[10]

## B. *PRE–JUDGMENT INTEREST*

■ It is well settled that state law applies to an award of prejudgment interest in a diversity action in federal court. *See, e.g., Baker v. Dorfman,* 239 F.3d 415, 425 (2d Cir.2000); *Schwimmer v. Allstate Ins. Co.,* 176 F.3d 648, 650 (2d Cir.1999). Since New York law applies in this case,

---

**9.** Because the existence of a clear and unambiguous promise is a necessary condition of liability based on promissory estoppel, the Court will not consider the remaining components of that liability theory.

**10.** In deciding a Rule 50(b) motion, the Court has two options: "[i]f a verdict was returned, the court may, in disposing of the new motion, allow the judgment to stand or may reopen the judgment and either order a new trial or direct the entry of judgment as a matter of law." Fed.R.Civ.P. 500(b). Although the language of Rule 50(b) itself does

not provide for the possibility of allowing part of a verdict to stand while vacating another part of it, the Court finds that it is permissible to dispose of Rule 50(b) motions in this manner. *See, e.g., Rodick v. City of Schenectady,* No. 90–CV–937, 1992 WL 373524 (N.D.N.Y. Dec.7, 1992), *vacated in part on other grounds,* 1 F.3d 1341 (2d Cir.1993) (granting Rule 50(b) motion with respect to special verdict on plaintiffs' false arrest claim, while allowing special verdicts on claims of deliberate indifference to medical needs and malicious prosecution to stand).

*see EMI I,* 317 F.Supp.2d at 418 n. 1, New York Civil Practice Law and Rules § 5001(a) ("N.Y.C.P.L.R. § 5001(a)") governs the issue of prejudgment interest. That section provides that "[i]nterest shall be recovered upon a sum awarded because of a breach of performance of a contract, or because of an act or omission depriving or otherwise interfering with title to, or possession or enjoyment of, property, except that in an action of an equitable nature, interest and the rate and date from which it shall be computed shall be in the court's discretion." N.Y. C.P.L.R. § 5001(a).

As noted above, EMI was awarded a judgment of $1,136,160.71 in damages at the summary judgment phase of this case. That award was based on EMI's claim for breach of contract and guaranty against Robinson, and its claim for account stated against Avatar. Because actions for account stated are generally considered to be equitable, the damages in this case may be seen as arising both from a breach of contract claim and from an equitable claim. It is not necessary, however, to construe the action one way or the other for purposes of determining whether prejudgment interest is mandatory or discretionary because the Court finds that an exercise of its discretion to grant such relief is warranted in this case.

Prejudgment interest is "computed from the earliest ascertainable date the cause of action existed, except that interest upon damages incurred thereafter shall be computed from the date incurred. Where such damages were incurred at various times, interest shall be computed upon each item from the date it was incurred or upon all of the damages from a single reasonable intermediate date." *Id.* § 5001(b). EMI has calculated the interest on the various components of the Court's damages award in accordance with these principles, at New York's statutory rate of nine percent, to total $238,262.00. Because the Court finds that EMI's calculations are appropriate, and because Defendants have not objected to them, the Court concludes that EMI should be awarded $238,262.00 in prejudgment interest.

## C. *ATTORNEY'S FEES AND COSTS*

The Distribution Agreement between EMI and Avatar grants EMI a security interest in certain collateral and provides that Avatar will pay all attorneys' fees and costs that EMI may incur in exercising its rights under the Distribution Agreement's security provisions. (*See* Distribution Agreement between EMI Music Distribution and Avatar Records, Inc., dated January 1, 2000, § 21, Trial Ex. 1.) EMI has calculated its attorneys' fees to total $204,387.03, for the period March 1, 2003 to May 5, 2004, the date on which the Court issued its summary judgment Decision and Order awarding EMI damages. EMI has provided the Court with extensive documentation of all of its legal expenses during this period and the Court finds them reasonable insofar as the fees charged fall within lodestar ranges courts in this District have approved. In addition, Defendants have not objected to EMI's calculation of attorneys' fees. Therefore, the Court finds that Defendants must compensate EMI for attorneys' fees and costs in the amount of $204,387.03.

## III. *ORDER*

For the reasons set forth above, it is hereby

**ORDERED** that the motion, pursuant to Federal Rule of Civil Procedure 50(a) ("Rule 50(a)"), of plaintiff EMI Music Marketing ("EMI") for judgment as a matter of law is GRANTED and that the judgment entered on October 20, 2004 based on the special verdict that was returned in

this case on October 7, 2004 in favor of defendant Avatar Records, Inc. ("Avatar"), finding liability on the theory of promissory estoppel, and the accompanying award of damages to Avatar in the amount of $25,000.00, be vacated as a matter of law; and it is further

**ORDERED** that EMI's motion, pursuant to New York Civil Practice Law and Rules § 5001, for prejudgment interest in the amount of $238,262.00 is GRANTED; and it is further

**ORDERED** that EMI's motion for attorneys' fees and costs in the amount of $204,387.03 is GRANTED; and it is further

**ORDERED** that the Clerk of Court is directed to enter an amended judgment modifying the judgment in the amount of $1,136,160.17 entered on October 15, 2004 in favor of EMI by adding thereto the awards for prejudgment interest and attorneys' fees and costs authorized herein.

**SO ORDERED.**